**McLOUTH STEEL CORPORATION,**
**Plaintiff-Appellee,**

**v.**

**JEWELL COAL AND COKE COMPANY,**
**Defendant-Appellant.**

**No. 76–1525.**

United States Court of Appeals,
Sixth Circuit.

Argued June 6, 1977.
Decided Jan. 12, 1978.

---

James D. Ritchie, Butzel, Long, Gust, Klein & Van Zile, George E. Brand, Jr., Detroit, Mich., for defendant-appellant.

W. Gerald Warren, William B. Cudlip, Douglas D. Roche, Dickinson, Wright, McKean & Cudlip, Stephen E. Dawson, Detroit, Mich., for plaintiff-appellee.

Before EDWARDS and CELEBREZZE, Circuit Judges, and ZIRPOLI,* Senior District Judge.

EDWARDS, Circuit Judge.

Plaintiff McLouth Steel Corporation, the tenth largest steel producer in the nation, filed this complaint under the diversity jurisdiction of the United States District Court for the Eastern District of Michigan, Southern Division, against Jewell Coal and Coke Company, a Virginia corporation with principal offices in Knoxville, Tennessee, and its affiliated coal companies, seeking enforcement by injunctive relief of a contract for sale and purchase of coke used in McLouth's furnaces. The contract was executed in 1961 with an initial term of 15 years and an

* Honorable Alfonso J. Zirpoli, Senior United States District Judge for the Northern District of California, sitting by designation.

option on McLouth's part to extend same for an additional 15 years.

The District Judge who heard this 54-day trial found all issues in favor of McLouth. He held the contract to be "an unambiguous requirements contract" and that Jewell was obligated to supply all coke (over 59,000 tons a month supplied under another contract) which McLouth required and ordered. He issued a mandatory injunction requiring Jewell to furnish coke as McLouth ordered it and to build replacement or new production facilities as needed to accomplish same. He reserved for later adjudication any Jewell claims of production cost increases due to inflation or antipollution laws. He also reserved computation of McLouth's claims for breach of contract damages and Jewell's counterclaims for similar damages. He then certified that the judgment was a final one and that there was no just reason for delay of this appeal, under Rule 54(b).

This case reminds us of stories from the Klondike gold rush of partners who willingly shared danger, cold and starvation in the search for gold and then fought (sometimes to the death) for sole possession of the gold strike with which fortune favored them.

Here in the early 1960's, at a time when the coal industry was greatly depressed, McLouth Steel Co. contracted with Jewell Smokeless Coal Corp.[1] for Jewell to build a coke plant and furnish coke to McLouth for 15 years, the contract being renewable at McLouth's option for another 15 years. The unilateral nature of the option which is now the major source of controversy is explicable in that Jewell, in the midst of lean years, approached McLouth with the proposal that McLouth give it a binding contract for coke which would provide Jewell with the necessary cash flow to secure the capital required to build a coke plant. The parties lived under the contract without major dispute until coal once more became king of the energy producers of the United States and its value went up in multiples.

Then, suddenly, McLouth wanted to buy more coke than it had ever bought and Jewell wanted to supply much less. Each, as might be guessed, found reasons. This bitter controversy resulted.

We find it impossible to describe the contract which is the center of this litigation without employing words which have interpretative shadings. In view of its relative brevity, we quote it in full, with the paragraphs which we believe to be critical emphasized:

This Agreement, made and entered into this 21st day of August, 1961, by and between Jewell Smokeless Coal Corporation, a corporation organized under the laws of the State of Virginia, with an office in Knoxville, Tennessee, hereinafter called the "Seller", and McLouth Steel Corporation, a corporation with an office in Detroit, Michigan, hereinafter called the "Buyer".

Witnesseth:

That the Seller hereby agrees to sell and the Buyer hereby agrees to buy and pay for, coke, under the terms and conditions, for the period hereinafter named, and the price hereinafter stated.

Term of Contract: This contract shall become effective as of the first day of May, 1963, and continue for a period of fifteen (15) years from that date with an option on the part of the Buyer to renew the contract for an additional term of fifteen (15) years by written notice to Seller on or before November 1, 1976, on the same terms and conditions as herein stated.

Quantity: The coke to be purchased and sold hereunder shall be Buyer's requirements of Blast Furnace Coke in excess of the amount which it is presently obligated to purchase from Semet-Solvay Division, Allied Chemical Corporation. Buyer's contract with Semet-Solvay Division, Allied Chemical Corporation, is dat-

---

1. Jewell was originally Jewell Smokeless Coal Corporation. In 1970–1971, its name was changed to Jewell Coal and Coke Company and Jewell Smokeless Coal Corporation ("Smokeless") was formed. Since then Jewell's busi-

ness has been the production and sale of coke and Smokeless has held the coal leases, operated the coal cleaning and preparation equipment, and performed the coal sales.

ed May 12, 1960, and requires that, after April 30, 1963, Buyer is obligated to purchase from them *the first* 59,000 *CTM BRT 11/22/61* [handwritten changes underlined] net tons of coke per month. *It is estimated that Buyer's requirements in excess of said purchases from Semet-Solvay Division, Allied Chemical Corporation, will average approximately 18,000 net tons of coke per month, and Buyer agrees that in no case shall purchases from Seller hereunder average less than 9,000 net tons per month.*

Quality: Coke to be delivered hereunder shall be of Blast Furnace Quality, sized 1″ × 4″, with an average analysis as follows:

| Fixed Carbon | 94% with a plus or minus ½ of 1% tolerance |
| Ash | 5.5 |
| Volatile | .50 |
| Sulphur | .65/.75 |
| Stability | 54 minimum |
| Porosity | 50 |
| Moisture | 3% maximum |

*Price: $14.25 per net ton f. o. b. cars at ovens, Vansant, Virginia.*

*Basis for Escalation: The base price per ton of coke listed herein is based on the present cost of producing, processing, washing and delivering coal to the coke ovens in effect as of the date of this contract at the mines of Seller. This present cost is $5.20 per ton. Effective at the end of each six months' period ending November 30 and May 31 during the term of this contract, there shall be added to or deducted from the price per net ton of coke f. o. b. oven to Buyer any increase or decrease in this cost due to change in wage rates, cost of supplies, taxes, laws, or any other item affecting this cost (of producing coal) as follows: For each variation of 10¢ in the cost (of producing coal), the price per ton of coke to Buyer shall be adjusted 15¢ per ton up or down. Coke plant labor shall also be escalated using as a base the wage scale in effect when the coke plant is placed in production.*

*Coal: The coal from which such coke is to be derived shall be from Seller's present miners to analyze approximately: 25.00 Volatile; 69.50 Fixed Carbon; 3.5 to 4.5 Ash; and .75 Sulphur.*

Deliveries: Coke shall be delivered in approximately equal weekly quantities. Each shipment must, however, be of not less than the 25-car minimum which is required to secure the best freight rate advantage.

Weights: Railroad track scale weights shall establish the quantities which are being shipped, but in no case should cars of coke be weighed within twelve (12) hours after quenching.

Payment: Buyer will pay Seller within fifteen (15) days after Buyer's billing, which shall be monthly.

*Contingencies: It is understood that Seller's failure to deliver, or Buyer's failure to accept, said coke in the event, and during the continuance, of any action by governmental authority (whether now or hereafter effective) preventing performance of this agreement in accordance with its terms, or failure to make or accept deliveries hereunder when due, if occasioned by act of God or the public enemy, fire, explosion, flood, war, riots, sabotage, strike, action of any governmental authority having jurisdiction in the premises, or any circumstance beyond either party's reasonable control, shall not subject such party to any liability to the other party hereto.*

*Buyer shall have the right to purchase from other sources any part of Buyer's coke requirements which Seller shall fail to supply Buyer.*

In Witness Whereof, the parties hereto have set their hands and seals the day and year first above written.

(Emphasis added.)

## HISTORY OF THE 1961 CONTRACT

The record discloses that, prior to the signing of this contract, Jewell was in the business of processing, cleaning and selling high grade, low sulphur metallurgical coal from mines which it held under leases. Pri-

or to 1963 it had never been in the business of producing blast furnace coke, a material which plaintiff McLouth used in great quantity for firing its furnaces.

Faced with losses in 1959 and an excess of current liabilities over current assets in 1960, the Thompson family, which owned controlling interests in and ran Jewell and its affiliated coal companies, contacted McLouth and initiated discussions of Jewell's undertaking to build a coke plant and supply a portion of McLouth's needs for coke. The contracting parties understood from these discussions that if Jewell built the plant, it would need to borrow capital therefor, and that the contract would have to contain a minimum take or pay monthly tonnage purchase guarantee from McLouth to Jewell. All through the negotiations Jewell was informed and understood that McLouth already had a 10-year contract with Semet-Solvay Division of Allied Chemical Corporation, for McLouth to purchase 59,000 tons of the coke it used each month from Semet-Solvay. When it developed that 9,000 tons take or pay would probably serve to provide sufficient cash flow for financing the necessary coke plant construction loan for Jewell, the last sentence of the contract paragraph labeled "Quantity" was drafted by McLouth.

McLouth drafted this in terms of "Buyer's requirements of Blast Furnace Coke in excess of the amount which it is presently obligated to purchase from Semet-Solvay Division," and concluded with its estimate: "Buyer's requirements in excess of said purchases from Semet-Solvay Division, Allied Chemical Corporation, will average approximately 18,000 net tons of coke per month, and Buyer agrees that in no case shall purchases from seller hereunder average less than 9,000 net tons per month."

With this contract in hand, Jewell proceeded to secure the necessary financing from Aetna Insurance Company and to build 210 "Mitchell"-type nonrecovery coke ovens at a site in Vansant, Virginia, which ovens had an approximate capacity of 20,000 to 22,000 tons of coke per month.[2] Operations under the contract continued with both parties in reasonable accord as to its operation for some years.

In 1965 Jewell, without consulting McLouth or seeking any contract amendment, expanded its coke capacity to between 28,000 to 30,000 tons of coke per month by adding 44 ovens of a different type. In 1966 McLouth ordered and Jewell supplied an average of 26,643 tons per month.

In 1967 and 1968, however, McLouth advised Thompson, of Jewell, that its monthly requirements would be substantially increased as a result of a changeover to a continuous casting process and discussed with him the expansion of Jewell's coke facilities so as to provide an estimated 36,000 tons per month. McLouth and Jewell tentatively agreed to amend the 1961 contract by changing 9,000 to 18,000 tons and 18,000 to 36,000 tons, thus doubling the minimum take or pay and doubling the estimate in the old contract. Although there were serious discussions about amendment of the contract to this purpose, they broke down on disagreements on other terms. Meantime, relying on McLouth's commitment to amend the contract, Jewell proceeded to build additional capacity up to 45,000 tons a month without outside financing. The 1961 contract was never formally amended, but McLouth exercised its option to extend it for the second 15-year period.

During the first six months of 1971, the District Judge found Jewell shipped to McLouth an average of 35,418 tons of coke per month, partly from the new ovens which it had built which were known as Plant No. 2. Thereafter, the situation concerning this contract changed markedly in two important respects. First, Jewell became acutely aware, partly as a result of consulting Stone & Webster, of the possibility that it could sell coke on the open market in excess of its contract price, plus escalation, with McLouth. Second, McLouth, which had up to then recognized the need to amend the contract to secure

2. Jewell also poured foundations for 44 other ovens for possible future expansion.

Jewell's commitment to supply 36,000 tons per month, began to demand 40,000 tons per month as a matter of right under the 1961 contract.

Additionally, the air pollution laws of the State of Virginia and the federal government began to appear ominously upon the horizon. The Virginia Air Pollution Control Board entered an order requiring Jewell to cease and desist operating Plant No. 1 by July 1975, and Jewell argued before this court that Plant No. 2 might be similarly affected by Virginia's air pollution standards. With this outline of the history of this contract, we turn to the most important of the legal issues.

## THE DISTRICT JUDGE'S FINDINGS AND CONCLUSIONS

The District Judge held that the contract we have printed above was a "requirements contract," that it was "unambiguous," that it was executed in Michigan and should be interpreted in accordance with Michigan law, and that under it Jewell was obligated to meet all of McLouth's increased requirements (which McLouth now estimates at 44,000 tons per month). He also held that if the Virginia air pollution standards, or those of the federal government, require replacing old coke-making facilities and building new facilities, Jewell is required by its contract so to do. In all these respects the District Judge held for McLouth, adding only that if after expansion of facilities it developed that higher construction costs demanded by the necessity of installing machinery to meet air pollution standards imposed "an unconscionable burden," Jewell could move under Paragraph 8 of the judgment entered by the District Court for a price adjustment to meet said situation. Needless to say, appellee McLouth supports the District Judge in all of these respects.

## APPELLANT'S CONTENTIONS

Jewell contends that in the first instance the District Judge erred in determining the contract to be a "requirements contract," and particularly erred in ignoring the 18,-000 ton per month estimate contained therein, turning it into a total requirements contract which McLouth now estimates may ultimately mean 51,000 tons per month, which McLouth may need and Jewell, under terms of the judgment, would be obligated to supply.

Jewell contends the District Judge erred in interpreting the contract under Michigan law, arguing that it was finally executed in Connecticut where the last conditions were fulfilled by Aetna's agreement to provide the financing.

Jewell also argues that the District Court erred in ignoring the large mass of parol evidence and holding that the contract did not need explanation by parol evidence since it was unambiguous.

In addition, Jewell contends that the contract should be construed as an agreement for Jewell to supply McLouth from the production (20,000 to 22,000 tons) of the Mitchell ovens only, and that since these ovens can no longer be operated legally, the contract is terminated.

Additionally, Jewell argues that the District Judge has failed to give effect to the portion of the contract which exempted the seller from liability for failure to deliver, based upon "action by any governmental authority having jurisdiction in the premises, or any circumstance beyond either party's reasonable control," and cites in this regard the impact of the federal environmental protection laws and the Virginia air pollution control standards.

Finally, by motion for rehearing filed after the District Judge's Findings of Fact and Conclusions of Law had been entered, Jewell argues that the 1961 contract, as interpreted and proposed to be enforced by the District Judge, represented an "acquisition" of all of Jewell's assets by McLouth and thus violated §§ 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14, 18 (1970), and § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1970).

## IS THIS CONTRACT SUBJECT TO MICHIGAN LAW?

■ Taking the issues of this case in logical sequence, and stating them as we

see them, we note the District Judge's conclusions pertaining to the law which controls interpretation of this contract:

Michigan conflict of laws rules apply. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487 [61 S.Ct. 1020, 85 L.Ed. 1477] (1941). Under Michigan law, interpretation of contract provisions are governed by the law of the state in which the contract was entered into. *Chrysler Corporation v. Insurance Co. of No. America*, 328 F.Supp. 445 (E.D.Mich.1971); *Rubin v. Gallagher*, 294 Mich. 124, 128 [292 N.W. 584] (1940). In Michigan, a contract is deemed to be made in the state where the last act necessary to make it a binding agreement took place, *State of Ohio v. Eubank*, 295 Mich. 230 [294 N.W. 166] (1940). The last necessary act for the formation of the 1961 agreement between these parties took place in the State of Michigan when Murphy of McLouth signed the agreement that had already been executed in the State of Tennessee. Insertion of the words "the first" in the quantity clause of the contract by Murphy did not serve to modify the contract nor did it constitute a counter offer. This is so because the parties thereafter, in writing and by their conduct, treated the insertion of these words as a "minor change" or a "slight change" which did not affect the substance of the provision and only served to clarify the words immediately following (DX 529, 530; Williston, A Treatise on the Law of Contracts, Section 73, 78 (Jaeger Ed. 1975)). Therefore, this agreement was consummated in Michigan [and] is governed by the laws of the State of Michigan.

We agree with the District Judge's conclusion on this point. Under these facts it is clear to us that appellant's contention that the District Court had no jurisdiction over Jewell is erroneous.[3]

3. There was clearly ample evidence of both contract and "contact" in Michigan to establish the court's jurisdiction over Jewell and to apply Michigan law to this controversy. Mich.Comp. Laws Ann. §§ 600.711(3), 600.715 (1968); *Southern Machine Co. v. Mohasco Industries,*

## IS THE CONTRACT "UNAMBIGUOUS" AS VIEWED BY THE DISTRICT JUDGE?

On this issue the District Judge held:

The language in the contract binding upon these parties is unambiguous and, therefore, must be given its natural and ordinary meaning. A court may not strain interpretation to find ambiguity where none exists. *Elston-Richards Storage Co. v. Indemnity Insurance Co.*, 194 F.Supp. 673 (W.D.Mich.1960); *Muir v. Leonard Refrigerator Co.*, 269 Mich. 406, 408 [257 N.W. 723] (1934); *New Amsterdam Co. v. Sokolowski*, 374 Mich. 340, 342 [132 N.W.2d 66] (1965). The parol evidence rule applies after it is established that the written contract is a complete and final expression of the agreement between the parties. Such an agreement may not be varied or contradicted by proof of an antecedent agreement or prior negotiations. The written contract supersedes and nullifies prior negotiations and antecedent agreements or understandings. The sole purpose for allowing Jewell to submit parol evidence was to permit Jewell to prove its contention that the language in the written contract was latently ambiguous, *Goodwin v. Coe Pontiac*, 392 Mich. 195 [220 N.W.2d 664] (1974). Such evidence did not establish an ambiguity and, therefore, may not now be considered to vary or contradict the plain meaning of the words used in the contract between these parties.

We do not agree.

The District Judge's entire Findings of Fact, Conclusions of Law, and Declaratory Judgment rely upon one sentence of the contract:

The coke to be purchased hereunder shall be Buyer's requirements of Blast Furnace Coke in excess of the amount which it is presently obligated to pur-

*Inc.*, 401 F.2d 374 (6th Cir. 1968); *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220 (6th Cir. 1972); *Donley v. Whirlpool Corp.*, 234 F.Supp. 869 (E.D.Mich.1964); *Mad Hatter, Inc. v. Mad Hatters Night Club Co.*, 399 F.Supp. 889 (E.D.Mich.1975).

chase from Semet-Solvay Division, Allied Chemical Corporation.

The District Judge construed this sentence to represent an undertaking on Jewell's part to furnish any and all coke over 59,000 tons required by McLouth for a period of 30 years in the event McLouth exercised its option. Jewell's undertaking, according to the District Judge, was absolutely without limit. He held that this sentence controlled, regardless of other provisions of the contract or the then existing relationships of the parties, or the then existing or foreseeable coke needs of McLouth's plants, or the nature and capacity of the coke production facilities which Jewell was to construct or constructed, or the amount of coal Jewell and its affiliates were capable of mining (or having mined), or owned or had under lease. In fact, the District Judge construed the contract so broadly in McLouth's favor that he enjoined Jewell to "produce and sell to McLouth . . . all of McLouth's blast furnace coke requirements in excess of 59,000 tons per month" and to "construct further additional coke producing facilities to satisfy such increase in McLouth's requirements." He also ordered that Jewell (even if it had first exhausted its own production) satisfy McLouth's requirements by the alternative means of "the purchase of coke on the open market or the carbonization by others of coal from its reserves."

We cannot find the contract described by the Declaratory Judgment of the District Judge either in the four corners of the document itself, or in the actions, relationships, words, or writings of the parties.

Far from being unambiguous, the contract which we quoted at the outset is actually beyond understanding if interpretation be confined to the words of the document. The simplest illustration of this is that it is dated "this 21st day of August, 1961," and contains as one critical sentence, "Price: $14.25 per net ton f. o. b. cars at ovens, Vansant, Virginia," even though no ovens existed in 1961. It also says in the escalation clause: "Coke plant labor shall also be escalated, using as a base the wage scale in

effect when the coke plant is placed in production." The parties fully understood, although the contingency was nowhere expressed in the document, that the contract was not to be effective at all until and unless Jewell (with the McLouth 9,000 ton per month take or pay contract in hand) succeeded in arranging the necessary financing for the construction of a then nonexisting coke plant. It is clear on this record that Jewell in 1961 could not have built any coke plant at all absent the McLouth 9,000 ton "take or pay" guarantee.

This is by no means the only gap or ambiguity in the contract which requires reference to the surrounding circumstances and the actions and positions of the parties. The contract also provides: "The coal from which such coke is to be derived shall be from Seller's present mines . . . ." The term "present mines" is not defined in any manner in the contract, and evidence on that score would have to be supplied from outside the contract itself. This is particularly true here where Jewell's mine holdings were (and are) exercised through a considerable number of affiliated companies and leases. This provision also directly contradicts the portion of the District Judge's declaratory judgment which makes Jewell responsible for purchasing coke or coal on the open market in order to supply whatever amount of coke McLouth might order. Jewell has never been in the coke brokerage business.

The clause entitled "Contingencies"—particularly the phrase "beyond either party's reasonable control"—bristles with ambiguity.

█ Additionally, the contract includes as its last operative paragraph entitled "Contingencies," "Buyer shall have the right to purchase from other sources any part of Buyer's coke requirements which Seller shall fail to supply Buyer." We find here an explicit recognition of McLouth's knowledge that the financing Jewell would be seeking would be based on the 9,000 ton take or pay guarantee and that the plant would be built to supply the 18,000 ton estimate and not all of the coke McLouth

might need in the course of 30 years. Reading this sentence together with the 9,000 ton take or pay provision and the 18,000 ton estimate of McLouth's requirements from Jewell in the Quantity clause (which we will deal with more fully in the next section of this opinion), the contract cannot be properly defined or interpreted under Michigan law without reference to the then existing and contemplated plant and equipment of both parties to the contract.

In short, we believe that the District Judge was right when he spent 54 days of trial listening to all the circumstances surrounding this contract, that he was likewise correct in relying on that mass of testimony in drawing his Findings of Fact, but that he fell into legal error when he purported to base his Conclusions of Law solely upon the limited and frequently ambiguous words of the contract itself.

In similar cases of ambiguity Michigan law clearly provides for the court's taking and considering evidence pertaining to the situation of the parties at the point of contract and to their contemporaneous and subsequent expressions and actions interpreting the document. In *Marx v. American Malting Co.*, 169 F. 582 (6th Cir. 1909), this court stated what we believe to be the Michigan law applicable then and now to the evidentiary question here involved:

> But the court below took another view of the stipulations of this contract, and held that the words, "Amount of malt to be used will be between 15,000 and 20,000 bushels," constituted a limitation upon the words, "Quantity, all their requirements to December 31, 1907." Accordingly all evidence given or offered to show the conditions and circumstances in which the contract was made, and in reference to which the parties were dealing, was, either directly or by the effect of instructions, put aside. There could be no complaint of this if the view which the court took of the contract was correct. The evidence referred to, however, was for the information of the court, and to enable it to rightly construe the agreement; and the effect of the ruling was to say that the language was clear and no aid was needed to interpret it. As we have said, we reach a different conclusion. We think such evidence was competent for the purpose for which it was offered. It was not disputed, and it disclosed highly important facts in aid of the right construction of the agreement. We do not say that all of the evidence offered was admissible for this purpose. *Mere words passing from one to another of the parties about matters which were subsequently reduced to writing were not admissible to alter, cut down, or enlarge the terms of the contract; but whatever had reference to the conditions and the probable requirements of the business which the vendee expected, and the knowledge of these conditions and expectations by the respective parties, was admissible. Within the rule, we think it was competent to prove by parol evidence that the vendor was informed of the conditions of the vendee's business and of the enlargement of the plant, and of the probable increase of the requirements resulting therefrom.* Runkle v. Burnham, 153 U.S. 216, 224, 14 S.Ct. 837, 38 L.Ed. 694; *Scott v. United States*, 12 Wall. 443, 20 L.Ed. 438; *Bell v. Bruen*, 1 How. 169, 11 L.Ed. 89; *Nash v. Towne*, 5 Wall. 689, 699, 18 L.Ed. 527; 9 Cyc. 587, where it is said:

> "To determine the intention of the parties, if the meaning is not clear, it is necessary that regard shall be had to the nature of the instrument itself, the condition of the parties executing it, and the objects which they had in view, for which purpose parol evidence is admissible."

*Marx v. American Malting Co., supra* at 585. (Emphasis added.)

### IS THIS AN ENFORCEABLE "REQUIREMENTS" CONTRACT UNDER MICHIGAN LAW?

We believe this contract in many ways is *sui generis*. Two of the biggest law firms in Detroit have labored mightily to find Michigan law which can be regarded as

controlling and neither has presented a case which comes close to approximating the fact situation presented here. The typical "requirements" contracts cases of the early 1900's which were relied upon by the District Judge and are McLouth's primary reliance on this appeal, involved contracts for one party's requirements of a certain product for a specific period of time—usually a year or less. Most included an estimate of the amount of the product dealt in by the parties.

It is clear to us, as it was to the District Judge, that Michigan case law up to the effective date of the Michigan Uniform Commercial Code in 1964 has treated an estimate in a requirements contract as only that and not as a maximum figure or "cap." Likewise, preceding case law varied from the underlined portion of Mich.Comp.Laws § 440.2306(1) (1967) (U.C.C. 2–306(1)):

Sec. 2306. (1) Output, requirements. A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, *except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.*
(Emphasis added.)

Michigan case law prior to 1963 allowed enforcement of a good faith requirement which exceeded the contract estimate even if it could be termed "unreasonably disproportionate" to the estimate. *See Marx v. American Malting Co.*, 169 F. 582 (6th Cir. 1909); *E. G. Dailey Co. v. Clark Can Co.*, 128 Mich. 591, 87 N.W. 761 (1901); *F. B. Holmes & Co. v. City of Detroit*, 158 Mich. 137, 122 N.W. 506 (1909); *Menominee Lumber & Cedar Co. v. Thomson*, 309 Mich. 263, 15 N.W.2d 155 (1944).

In each of these cases, however, the emphasis of the court was upon the known or foreseeable quantity required by the buyer or produced by the seller. The court looked to what the parties knew at the time of contract about each other's plant or business, rather than to any stated estimate.

In *F. B. Holmes v. City of Detroit, supra,* the court said:

We find no difficulty in ascertaining the prime object and purpose of these parties as expressed in the writings considered. They had in mind so many barrels of cement as the operations of this department would require during this period. The exact amount of cement which would be required could not be known at the time of entering into the contract, as the first meeting of the board of estimates does not occur until in March.

*F. B. Holmes v. City of Detroit, supra,* 158 Mich. at 142, 122 N.W. at 507–08.

In *Menominee Lumber & Cedar Co. v. Thomson, supra,* the court said:

The necessity of harvesting and storage was imperative and known to defendant, who also knew that ice not requisitioned would be a total loss to plaintiff.

*Menominee Lumber & Cedar Co. v. Thomson, supra,* 309 Mich. at 268–69, 15 N.W.2d at 157.

In *Marx v. American Malting Co., supra,* this court said:

[I]t is a fundamental rule in the interpretation of agreements that we should ascertain the prime object and purpose of the parties, and, in case of ambiguity produced by its minor provisions, the latter should, if possible, be so construed as not to conflict with the main purpose. It is clear enough that these parties had in mind, not the sale of a certain number of bushels of malt, but so much as the business of the vendee would require during the period mentioned.

*Marx v. American Malting Co., supra* at 584.

In *E. G. Dailey Co. v. Clark Can Co., supra,* the Supreme Court of Michigan said:

Many of the improvements now complained of were either then completed or were in progress at the time the contract was made. There is evidence to show that Clark knew of these improvements; that he went through plaintiff's plant; that he congratulated plaintiff's mana-

ger, Dailey, upon the increase of business; that Dailey informed him that its business was growing; that he wanted a contract to deliver him just as many cans as were needed; and that Dailey told him the company contemplated building a new brick building, so as to further extend the business.

*E. G. Dailey Co. v. Clark Can Co., supra,* 128 Mich. at 597, 87 N.W. at 763.

■ We draw three legal principles from these cases. The first is that in Michigan (prior to the Uniform Commercial Code) an estimate in a requirements contract did not control over the good faith needs of the ordering party. The second is that good faith need would be judged by the courts on the basis of what each contracting party knew about the nature of the other's business at the point of contract. The third principle is that requirements contracts were legally enforceable under Michigan law in 1961 and 1963 when the McLouth-Jewell contract came into being.

■ Finally, we observe that, although the McLouth-Jewell contract is poles apart from the contracts illustrated above in quantity and value and time of performance, we find no legal distinction which defeats its enforceability.

## WHAT REQUIREMENTS ARE ENFORCEABLE UNDER THE CONTRACT?

■ The most difficult question we have to determine is the amount of coke which this contract requires Jewell to deliver on McLouth's demand. In this regard we look to the contract itself, the parties' known or reasonably foreseeable needs or capabilities and the interpretation of the contract by the parties themselves in the course of its performance.

There were four definable stages of contract performance which require consideration. They may be designated by the year concerned.

## THE 1963 STAGE

Neither party to this dispute denies that the contract which we have quoted in full above was entered into freely and that it became enforceable at least by 1963 when the 210 Mitchell ovens were built and placed in operation. As of then, Jewell could have required McLouth to take and pay for the minimum 9,000 tons per month of coke provided in the contract, and McLouth could have demanded that Jewell provide it with all of the coke the Mitchell ovens were capable of producing, a figure which this record establishes at between 20,000 and 22,000 tons per month.

The only basis on which Jewell now seeks to avoid its commitment to supply McLouth with the approximate tonnage referred to immediately above is because of Virginia air pollution controls. This issue has yet to be tried, and we do not purport to make any disposition of it. We do, however, agree with the District Judge that no facts currently before us serve to terminate Jewell's obligation to perform the contract absent future proofs of impossibility.

In short, to the extent that the District Judge's Declaratory Judgment applied to the originally developed production of 20,000 to 22,000 tons of coke per month, we regard the District Judge's order enforcing the contract as valid. This tonnage is consistent with the specific wording of the contract. It is in reasonable accord with the 18,000 ton estimate contained therein, although Michigan law in 1963 did not require such accord. It is consistent with the foreseeable needs of the McLouth operation as of the time of the signing of the contract. It is also consistent with the interpretation of the parties themselves in carrying the contract into effect. The record is clear that Jewell readily complied with McLouth's orders up to (and exceeding) 22,000 tons.

## THE 1966 STAGE

The critical feature of this contract dispute concerns whether or not the conduct of the parties between 1963 and 1967 shows that the parties themselves interpreted the

contract as calling for additional tonnage up to 26,643 tons per month. The District Judge's findings (which are fully supported by the evidence on this score) include these facts. 1) McLouth in 1966, without any basic change in plant, increased its orders to Jewell to an average of 26,643 tons per month; 2) Jewell, without consulting McLouth, built 44 additional Australian-type ovens at the Vansant site; 3) Jewell received and supplied McLouth's requirements for coke up to the 26,643 figure; and 4) both parties clearly relied on the 1961 contract for such important matters as price, quality, and delivery in the furnishing and receipt of the 26,643 tons of coke.

The Michigan Supreme Court provides this statement concerning the importance of the construction of a contract by the parties' actual performance under it:

> "It is to be assumed that parties to a contract know best what was meant by its terms and are the least likely to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights; and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less likely to have been mistaken as to the meaning of their contract during the period when they are in harmony and practical construction reflects that meaning than when subsequent differences have impelled them to resort to law and one of them then seeks a construction at variance with their earlier practical construction of its provisions."

*Detroit Greyhound Employees Federal Credit Union v. Aetna Life Ins. Co.,* 381 Mich. 683, 692, 167 N.W.2d 274, 279 (1969) (quoting 17 Am.Jur.2d, Contracts § 274, at 685 (1964)).

Since the parties themselves freely construed this contract to require delivery of 26,643 tons of coke, we hold the contract is also enforceable up to this quantity.

## THE 1968 STAGE

Starting in 1967 McLouth launched a major change in its steelmaking processes. It spent well over $100,000,000 to change over to a continuous casting system (concast), thus increasing its steelmaking capacity and increasing its need for coke. In 1968 McLouth initiated discussions with Jewell to increase Jewell's productive capacity to 36,000 tons per month which McLouth felt it would need. McLouth recognized, concurrently with the development of the continuous casting plan, that the additional tonnage which McLouth would want from Jewell as a result of the concast development would require a new or amended contract. In contrast to the 44 Australian-type ovens which Jewell built on its own initiative, McLouth this time initiated discussion of Jewell's expansion. What follows is 1968 correspondence between the principal negotiator for McLouth, G. E. Gann, and the principal negotiator for Jewell, B. R. Thompson, plus an internal memorandum from Gann to other McLouth executives, which demonstrate conclusively that both parties considered further tonnage expansion to be beyond the terms of the 1961 agreement. Thus on April 26, 1968, in a McLouth internal memorandum, after discussing the possibility of increasing the 59,-000 tons per month from Semet-Solvay by another 20,000 tons, Gann turned to consideration of Jewell as a prospective supplier for its increased needs and said as follows:

> The balance of our coke requirements, up to 23,000 tons per month, comes from Jewell Smokeless Coal Company on a long term contract ending May 1, 1978. The current price delivered is $20.18 also subject to escalation. This contract covers all our requirements in excess of the 59,000 net tons presently obligated to Semet-Solvay, up to their plant capacity or their ability to produce.

> Jewell Smokeless is faced with an air pollution problem that is synonymous with the small Mitchell Type Bee Hive oven that he now operates. The best way and the cheapest way to lick this problem is to convert all his ovens to the large Australian Sole Flue type ovens which

would simplify his smoke problem. One hundred of these big ovens would permit him to increase his monthly production rate to above 40,000 net tons. More than enough to take care of any foreseeable increase in requirements by us.

On May 15, 1968, Gann wrote Thompson the following letter:

As a result of our many conversations and discussions about our future coke requirements and the extent of Jewell Smokeless participation, we would like to confirm the following understanding.

(A) From now till June 30, 1970 McLouth will commit to Jewell Smokeless all of their coke requirements over and above the 59,000 tons monthly now committed to Semet Solvay.

(B) Beginning July 1, 1970 McLouth will commit to Jewell Smokeless all of their coke requirements over and above 65,000 tons monthly that will then be committed to Semet Solvay.

These commitments of course will be contingent on the ability of Jewell Smokeless to perform and assurance to this affect must be forthcoming as soon as possible.

Under the terms of our present contract we are committed for 9,000 to 18,000 tons per month. We agree our new contract should read 18,000 to 36,000 tons per month.

It would be our intention to simply amend our present contract to cover these changes and to incorporate any other thinking that we might mutually agree upon.

In response to Gann's May 15 letter, on November 4, 1968, Thompson wrote Gann as follows:

Please be advised that Jewell Smokeless Coal Corporation has begun construction of 30 coke ovens, size 50 x 11, to enable us to manufacture approximately 42 to 45,000 tons of coke per month and we anticipate now that production will begin twelve to fifteen months from this date. Our exact target date will depend, as you know, on the availability of materials.

We are embarking on this construction program based on your assurance that our supply contract with you dated August 21, 1961, will be amended so as to increase the maximum tons to be purchased thereunder from 18,000 tons of coke per month to 36,000 tons of coke per month, and the minimum to be purchased from 9,000 tons per month to 18,000 tons per month.

We trust that the above is the assurance which you requested of this company in your letter of May 15, 1968.

While the letters we have quoted would seem to indicate that both parties were in mutual agreement concerning the new contract, the facts proved to be quite different. McLouth wanted the contract to be increased to the new quantities at the original 1961 base price, plus escalation. It also wanted to continue Semet-Solvay as the supplier of first choice from whom McLouth was obligated to buy the first 59,000 (or 65,000) tons of coke. Jewell wanted an increase in the per ton price of coke and wanted to be on a parity with Semet-Solvay in the event McLouth again faced months or years of lower production and lower demand for coke. These conflicts were never resolved and no amended contract, let alone new contract, was ever signed. The fact that agreement was not reached does not, however, alter the mutual recognition in 1968 that the 1961 contract could not properly be construed to cover the McLouth needs produced by the concast system.

### THE LITIGATION STAGE (1971 until Now)

The coke ovens, called Plant 2, which Jewell started to build in 1968 in reliance on McLouth's promise to amend the contract, were completed by 1970. They were built with a technology aimed at compliance with environmental laws. They increased Jewell's coke production by 21,000 tons. For a time Jewell supplied McLouth's increased needs from Plant 2 also. In the first six months of 1971, the District Judge found Jewell shipped an average of 35,418 tons of coke per month.

The parties were, however, moving farther apart in their interpretation of the contract. Jewell, aware of higher prices for coke on the spot market, began selling coke to others (some on long-term contracts) and began telling McLouth it could not meet McLouth's needs. McLouth began to take the position (regardless of the prior negotiations to amend the contract) that it was entitled to all the coke it ordered from Jewell. On June 29, 1971, it wrote Jewell a letter ordering 40,000 tons of coke per month, "under the terms of our contract." Jewell refused to supply this quantity, and after further unsuccessful negotiations, McLouth filed the instant complaint on December 1, 1972.

Pending this litigation, the parties continued in business together as a result of what they called a "tire patch" agreement negotiated May 31, 1972. At least through 1974 Jewell has been supplying up to 28,000 tons of coke per month on McLouth's orders. The "tire patch" agreement, however, was made "without prejudice" to the opposing claims of the parties in this dispute.

■ We have previously held that the McLouth-Jewell contract was an enforceable requirements contract under Michigan law. We now add that the evidence concerning the needs of McLouth, as determined by its steelmaking processes in 1963, and the capability of Jewell, as determined at the same time, plus the evidence concerning how the parties themselves interpreted the contract in 1966 and 1968, necessitate the holding that the 26,643 average monthly tonnage found by the District Judge for 1966 is the maximum tonnage which, under Michigan law, is enforceable under this contract.

## THE "CONTINGENCIES" CLAUSE

■ The District Judge found (and we agree) that the 1974 order of the Virginia Air Pollution Board (upon which appellant Jewell relies and which has been stayed pending this appeal) should not be regarded as excusing Jewell's performance of this contract because of the force majeure provisions contained therein.

The contract provision at issue reads as follows:

Contingencies: It is understood that Seller's failure to deliver, or Buyer's failure to accept, said coke in the event, and during the continuance, of any action by governmental authority (whether now or hereafter effective) preventing performance of this agreement in accordance with its terms, or failure to make or accept deliveries hereunder when due, if occasioned by act of God or the public enemy, fire, explosion, flood, war, riots, sabotage, strike, action of any governmental authority having jurisdiction in the premises, or any circumstance beyond either party's reasonable control, shall not subject such party to any liability to the other party hereto.

Clearly to this date no final order by any "governmental authority having jurisdiction in the premises" has prevented Jewell's compliance with this contract. Nor is there any certainty on this record that any governmental authority will in the future.

## THE REMEDY

■ The District Judge found (and we agree) that the McLouth-Jewell contract did not contain any limitation of Jewell's supply of coke to McLouth to any particular plant. Clearly Jewell did not construe the contract as limited to the Mitchell ovens. It voluntarily and repeatedly shipped to McLouth from other of its coke plant facilities.

The District Judge's Declaratory Judgment—presumably because it found this contract to be a requirements contract without any limit—specifically orders Jewell to build new coke plant facilities in compliance with Virginia air pollution standards to replace the 210 Mitchell ovens or to purchase coke on the open market to fulfill this contract.

We see no need at this juncture to face all of the questions which this order would produce. The court's Declaratory Judgment which we are affirming mandatorily enjoins Jewell and its officers and agents to

continue to perform this contract. We have now affirmed this judgment with a maximum which McLouth can demand under the contract of 26,643 tons per month.

We doubt that enforcement of this judgment as modified will prove to be a problem. However, if it does, contempt proceedings and money damages should prove an adequate remedy. Jewell surely is collectible.

## DAMAGES

We also note the District Judge's extensive conclusions of law on past contract damage claims. These claims have yet to be heard and we decline to review the legal conclusions submitted until the hearing record on damages is completed.

## THE DECLARATORY JUDGMENT

For the reasons stated above, the Declaratory Judgment is affirmed, but only to the extent set forth and as modified (see italics) below. The balance of the Declaratory Judgment is vacated. The Declaratory Judgment as modified is as follows:

### DECLARATORY JUDGMENT
### (COUNT I)
Permanent Injunction Pursuant
to Findings of Fact and
Conclusions of Law
(Entered August 28, 1975)

This cause came on to be heard for trial on the verified amended complaint of plaintiff McLouth Steel Corporation (McLouth), and the court having heard and considered oral and documentary evidence and having separately filed on May 1, 1975, its Findings of Fact and Conclusions of Law pursuant to 52 F.R.Civ.P. as to the issues of contract interpretation and liabilities under Count I of the Amended Complaint and the Amended Counter Claim herein;

Now, Therefore, It Adjudged and Decreed that:

### DECLARATORY RELIEF

The 1961 Agreement (hereinafter the Agreement) is binding upon McLouth and defendants Jewell Coal and Coke Company and the present Jewell Smokeless Coal Corporation, collectively referred to as "Jewell."

This Agreement between McLouth and Jewell is a requirements contract *executed under the law of Michigan*. Pursuant to the terms of this Agreement, Jewell is obligated, upon reasonable advance notice from McLouth, to sell and McLouth is obligated to buy from Jewell until April 30, 1993, all of McLouth's requirements of blast furnace coke in excess of 59,000 tons per month, *up to a maximum of 26,643 tons per month.* The Agreement neither expressly nor impliedly designates a specific battery of ovens nor any other specific asset of Jewell as the sole equipment from which Jewell is to fulfill McLouth's requirements. Such blast furnace coke is to be of the quality specified in the Agreement and is to be sold under the terms of the Agreement pertaining to prices, escalation, duration, deliveries, weights, payments and contingencies.

### PERMANENT INJUNCTION

Jewell shall, commencing on the date hereof and continuing through April 30, 1993, produce and sell to McLouth, and McLouth shall buy from Jewell all of McLouth's blast furnace coke requirements in excess of 59,000 tons per month, *up to a maximum of 26,643 tons per month.* Such blast furnace coke is to be of the quality specified in the Agreement and it is to be sold under all of the terms of the Agreement pertaining to price, escalation, duration, deliveries, weights, payment and contingencies.

In the event that in any month Jewell shall be unable to perform its obligation as construed herein, McLouth shall have the right to obtain furnace coke from sources other than Jewell in sufficient quantity to make up the difference between the quantity shipped to McLouth in that month by Jewell and McLouth's requirements less 59,000 tons. Any differential between the contract price and the delivered price paid for the coke purchased in accordance with this paragraph

shall be adjusted between the parties in the following month by adding to or subtracting from the total payment to be made by McLouth to Jewell in that month. McLouth shall make available for inspection by Jewell at McLouth's offices in Detroit, all invoices, freight bills, and shipping records relating to any such cover purchases.

In the event that Jewell asserts that the cost of compliance with its obligation to supply coke, as set forth herein, will cause an unconscionable burden upon it, Jewell shall be afforded an opportunity to introduce evidence to establish its costs to supply the coke required under the Agreement, Provided, However, that Jewell can first establish that it has in making such deliveries exhausted its entire production capacity from its existing facilities, and, Provided Further, that any additional coke which it supplied was in fact supplied by the least expensive means available. If such cost for delivery, after compliance with these provisions, is so substantially disproportionate to the price then being paid under the Agreement as to create an unconscionable result, as asserted by Jewell, the court may adjust the price to be paid for such coke supplied to avoid such result.

During the remaining duration of the Agreement, the defendants, their directors, officers, agents, employees and attorneys, and all other persons in active concert or active participation with them to whom knowledge of the order shall come shall absolutely desist and refrain from:

(a) Terminating, delaying, interrupting or otherwise failing the making of regular and timely sales to McLouth of the quantities of coke ordered by McLouth *up to the maximum specified herein.*

(b) In any way harassing, threatening and attempting to intimidate or economically coerce McLouth with respect to termination, delay or interruption of regular and timely deliveries of all coke required to be sold under the terms of the Agreement.

While we have already clearly implied rejection of appellant Jewell's remaining issues, we deal briefly with them below.

## REMAINING ISSUES

■ We perceive no law or logic to support appellant Jewell's argument that the Virginia Air Pollution Control Board is a necessary party to this purely contractual dispute.

■ We find no merit to appellant's claim that this contract as interpreted above creates or tends to create any monopoly in the coke market.

The disposition we have indicated above also serves to moot appellant's contention that McLouth by this contract has violated the antitrust laws by "acquiring" Jewell.

■ We find no merit to appellant Jewell's contention that McLouth is barred from equitable relief by the fact that at times in the life of the instant contract it bought coke from other suppliers than Jewell. The findings of fact of the District Judge on this issue are not clearly erroneous.

Further, the McLouth-Jewell contract guaranteed Jewell only 9,000 tons per month and did not exclude McLouth's purchases from others of coke which Jewell could not or did not supply. Any claims that McLouth violated the contract to Jewell's damage by failing to order its actual requirements over 59,000 tons may be adjudicated in the hearing on damages.

The case is remanded to the District Court for further proceedings consistent with this opinion.'