**William P. WELLS d/b/a Recmart, Plaintiff-Appellee, Cross-Appellant,**

v.

**10–X MANUFACTURING COMPANY, Defendant-Appellant, Cross-Appellee.**

**Nos. 77–1410, 77–1411.**

United States Court of Appeals, Sixth Circuit.

Argued June 20, 1979.

Decided Oct. 30, 1979.

Timothy Wittlinger Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for defendant-appellant, cross-appellee.

James J. Harrington, III, Fitzgerald, Young, Peters, Bruno & Bunn, Neill T. Peters, Lisa Sewell DeMoss, Detroit, Mich., for plaintiff-appellee, cross-appellant.

Before CELEBREZZE, Circuit Judge, PHILLIPS, Senior Circuit Judge, and THOMAS, District Judge.*

HARRY PHILLIPS, Senior Circuit Judge.

10–X Manufacturing Company (10–X) appeals from a judgment of the district court finding it liable for breach of contract in this diversity action brought by William P. Wells d/b/a Recmart (Wells) for breach of contract, negligence, and fraud. Wells cross-appeals from a separate judgment of the district court in which he was awarded money damages for the breach. The contract in question concerned the manufacture by 10–X of chamois cloth hunting shirts for Wells.

The issues of liability and damages were tried separately before the district court. In its memorandum opinion of January 6, 1977, the district court found 10–X liable solely on the ground of breach of contract. The court found the subject matter of the contract to be within the scope of the Uniform Commercial Code (the Code or U.C.C.), as it has been adopted in Michigan,[1] concluding that the contract was for the special manufacture of goods and was a transaction in goods, rather than a contract for services as 10–X had urged.

After a hearing on the issue of damages, the district court filed a memorandum opin-

---

* The Honorable William K. Thomas, United States District Court for the Northern District of Ohio, sitting by designation.

1. Michigan Comp. Laws Ann. §§ 440.-1101–.9994. Uniform Commercial Code references will be according to the section numbers of the Official Text of the Code promulgated by The American Law Institute and the National Conference of Commissioners on Uniform State Laws. The identity of the sections of the Official Code has been preserved in Michigan by combining the Michigan Compiled Laws chapter number (440) with the official numbers, e. g., § 1–101 in Michigan Compiled Laws is § 440.1101.

ion on February 22, 1977, awarding damages to Wells in the amount of $40,292.15. The district court relied on § 2–713 of the U.C.C. as the measure of damages for the breach, allowing the difference between the market price of the shirts at the time of the breach and the contract price, together with incidental damages, but less the expenses saved by Wells in consequence of 10–X's breach. The court found that Wells was not entitled to damages for precontractual expenses incurred by him in the development of the shirt.

The principal issue raised on this appeal is whether the Code, as it has been applied in Michigan, governs the contract between Wells and 10–X. We conclude that the Michigan Supreme Court would not view the contract in this case as coming within the purview of the Code. However, it is the opinion of this court that under the common law of Michigan 10–X was in breach of its contract with Wells, for which Wells is entitled to damages.

# I

On May 9, 1973, Wells contacted C. R. Blume, the president of 10–X, by telephone concerning the possibility of 10–X manufacturing a chamois cloth hunting shirt. Wells had developed the design for the hunting shirt and hoped to take advantage of a perceived marketing opportunity in the area of recreational apparel. However, Wells was principally marketing oriented and preferred not to become directly involved in manufacturing.

With respect to the development of the shirt, Wells had consulted an apparel manufacturer and department store buyers for the purpose of determining design and price. Other preliminary steps included the development of a pattern and prototype shirt, a style preference study, and a mail order advertising marketing study, all of which were completed by early 1973. Wells followed his initial contact with a letter to Blume on May 10, 1973, in which Wells

suggested a contract for the manufacture of 550 dozen shirts. The shirts were to be of various sizes, made from two different colors of chamois cloth according to Wells' sample and specifications, with shipments from 10–X to begin on or before August 1, 1973.

Blume wrote Wells on May 23, 1973, quoting a price of $3.30 per unit to "cut, make, and finish [the shirts] including thread and freight," and proposed to start delivery of the shirts in August, with completion of the 550 dozen shirts over a 60 to 90 day period. Blume estimated that "seconds" could be kept within two percent. On May 29, 1973, Wells wrote Blume and informed him that the $3.30 cost per unit and two percent allowance for seconds were acceptable. Wells stated that delivery had to begin by August 1, 1973, and earlier if possible, with the entire order completed by mid-October. In a telephone conversation between Wells and Blume on June 4, 1973, Blume agreed to Wells' delivery requirements. During the course of these negotiations it was agreed by the parties that Wells would furnish fabric, buttons, labels, patterns for the samples, graded patterns, cutting dies, and packaging materials for the shirts.

By June 13, 1973, Wells had sent 10–X the materials necessary for making a production sample, including a sample shirt, fabric, buttons, labels, patterns, and pattern notes. A production sample of the shirt was made by 10–X so that any potential design or manufacturing problems could be corrected before starting the actual production run. On July 16, 1973, Wells went to the 10–X plant in Des Moines, Iowa, to inspect the production sample. Although the sample had not been completed because the buttonhole machine was not working, Wells approved the sample with only minor changes.[2] Wells discussed with 10–X officials the shirt's manufacturing tolerances, which were more restrictive than those recognized in the trade for heavy-weight

---

2. At that time, the parties discovered that 10–X had never received a specifications/tolerance sheet for the shirts from Wells. Nevertheless, the sample was measured against Wells' tolerances and the sample shirt did not deviate significantly from those tolerances.

shirts. However, officials of 10–X agreed to manufacture the shirts in accordance with the specifications required by Wells. At no time was Wells advised that there would be any difficulty in meeting these tolerances. The parties further agreed to begin production immediately with a 200 unit sample cut.

On August 1, 1973, Wells went to Des Moines to check on the progress of the shirt. No shirts had been completed at that time and the buttonhole machine was still malfunctioning. On August 6, 1973, Wells wrote Blume concerning the delay in the manufacture of the shirts. Wells detailed a revised production and delivery schedule for the shirt that had been formulated by Mark Eliot, the 10–X vice-president in charge of operations. Wells further stressed that, for Recmart to be successful with the shirt, time was of the essence and the shirts had to be uniformly of the high quality that had been discussed previously by the two men.

On August 13, 1973, Wells returned to Des Moines. The buttonhole machine was still not working properly and no shirts had been completed. By August 15, 1973, some shirts had been finished, but they contained numerous defects in workmanship and did not conform to the tolerances agreed to by the parties. Wells and Michael Anderson, chief operating officer of 10–X, agreed that further cutting on the shirt would be discontinued and that 10–X would complete only the 1,616 shirts that had already been cut.

Wells received the first 25 shirts completed by 10–X on August 31, 1973. The shirts were individually inspected and did not meet the tolerances the parties had agreed upon. Moreover, the shirts contained numerous defects in workmanship, including uneven stitching, crooked collars, and inexact placement of the buttons and buttonholes. A similarly defective shipment of approximately two dozen shirts was received by Wells from 10–X on September 4, 1973. A third shipment of approximately two dozen shirts arrived from 10–X the following day and was returned by Wells unopened.

Wells ordered complete termination of production on September 7, 1973. A decision to stop all work on the chamois cloth shirts had been made by 10–X the previous day.

## II

In its memorandum opinion finding 10–X liable to Wells for breach of contract, the district court first considered whether the agreement between the parties was governed by the Code. The court noted that the Code defines the parameters of its application in U.C.C. § 2–102 generally to include "transactions in goods," unless the context of a particular section requires otherwise. The court further pointed out that the primary definition of "goods" in U.C.C. § 2–105 specifically includes "specially manufactured goods." The court found that "10–X agreed to manufacture for Wells a specially designed chamois cloth shirt for which Wells was to provide all materials except thread," and concluded the contract for manufacture of the shirts was covered by the Code. The court discounted, for purposes of application of the Code to contracts for sales, the fact that Wells supplied substantially all the materials for the production of the shirt.

The court next noted that the negotiations between Wells and Blume were "consummated by a contract for the sale of goods," pursuant to U.C.C. § 2–204, which contract was modified a number of times by the parties in accordance with U.C.C. § 2–209. The court further stated, with respect to the stringent tolerances Wells had required in the manufacture of the shirts, that U.C.C. § 1–205 dictates that the express terms of a contract control over both "course of dealing" and "usage of trade" in an industry. Finally, the court observed that U.C.C. § 2–314 implies into every contract for the sale of goods a warranty of merchantability.

The district court then stated, on the issue of breach of contract, as follows:

First, the evidence is clear that 10–X produced only 78 shirts under its contract with Wells. Even when the contract was

mutually rescinded on August 15, the parties agreed to continue production on the 1,616 units already cut; the number of shirts actually produced under this contract is less than 1½% of the number originally agreed upon.

Second, no shirts were delivered until August 31, three weeks later than the modified agreement required and far too late for Wells to meet the demand precipitated by his magazine advertising.

Third, the shirts actually produced by 10–X were of such inferior quality that they could not be sold at retail. It is uncontradicted that they deviated in numerous instances from the tolerances agreed upon by the parties in their modified contract; moreover, even the most casual observation reveals a consistent pattern of inferior workmanship.

Given these facts and the applicable Code provisions, this Court unequivocally finds a clear and material breach by 10–X of the operative provisions of its agreement with Wells, including quantity, quality, delivery, and implied warranty.

The court held that Wells would be entitled to his full measure of remedies under Article 2 of the Code. After a subsequent hearing on the issue of damages, the district court awarded Wells $40,292.15 in damages, relying on the damage provisions of the Code.

### III

■ Before discussing the merits of this case, the court must first determine the state law that controls the interpretation of the contract in issue. Since this diversity action was brought in the United States District Court for the Eastern District of Michigan, Michigan conflict of laws rules apply. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *McLouth Steel Corp. v. Jewell Coal & Coke Co.*, 570 F.2d 594, 601 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). Under Michigan law, "[t]he validity and construction of a contract are controlled and to be determined by the laws of the *situs*, or place where the contract was entered into." *Ru-*

*bin v. Gallagher*, 294 Mich. 124, 128, 292 N.W. 584, 586 (1940) (opinion by Justice Thomas F. McAllister); *McLouth Steel Corp.*, 570 F.2d at 601. In Michigan, a contract is deemed to have been made in the state where the last act necessary to make it a binding agreement took place. *Id.; State of Ohio v. Eubank*, 295 Mich. 230, 233–34, 294 N.W. 166 (1940). There is no dispute by the parties that the contract was formed in Michigan, and, therefore, Michigan law applies.

■ The central question raised in this appeal involves the application of a Michigan statute (the U.C.C.) to a contract for the manufacture of shirts, presumably as it would be applied by the Michigan Supreme Court. However, this court cannot state categorically what result the Supreme Court of Michigan would reach under similar circumstances. There is no declaration of that court to which we can turn in determining whether this type of transaction is within the contemplation of the Code. Thus, it is our obligation "to make a considered 'educated guess'" as to what conclusion would most likely be reached on the issue by the Michigan Supreme Court, on the basis of the present state of the Michigan law as well as that of other jurisdictions. *Ann Arbor Trust Co. v. North American Company for Life and Health Insurance*, 527 F.2d 526, 527 (6th Cir.), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2206, 48 L.Ed.2d 818 (1975). *See also* C. Wright, *Law of Federal Courts* § 58 (3d ed. 1976).

It is the position of 10–X that the contract for manufacture of the hunting shirts was one essentially for services and, as such, was not governed by the Code. 10–X further asserts that the analysis by the district court "that the term 'goods' includes 'specially manufactured goods' overlooks the threshold issue: whether the contract contemplated the sale of goods or manufacturing of goods." Finally, 10–X contends, the failure of the district court to apply Michigan common law to the contract resulted in an incorrect conclusion with regard to its liability for breach of contract.

Wells submits the district court's application of the Code to the transaction was the correct result based on the facts and applicable authority. Wells asserts that "the issue here is not whether the contract is one for the sale of goods or for the provision of services, but whether . . . [the] contract entails the manufacture of specialty goods." Consequently, Wells argues, the inquiry should not focus on whether the predominant feature of the contract is the rendition of services, with goods incidently involved. Rather, Wells suggests, the test should be whether the goods are manufactured to the specifications of the buyer and are not suitable for sale to others in the ordinary course of the seller's business. In any event, Wells contends, the same result will obtain in this case regardless of whether the U.C.C. is applied to the contract.

## IV

■■ Section 2–102 of the Code defines the scope of Article 2 to include "transactions in goods." Although the term "transaction" is not defined in the Code,[3] "goods" that are the subject of sales under Article 2 consist of all things, whether specially manufactured or not, that are movable at the time of identification to the contract for sale. U.C.C. § 2–105(1); 1 R. Anderson, *Anderson on the Uniform Commercial Code*, § 2–105:4 (2d ed. 1970).

■■ It is clear that Article 2 of the Code is intended to have broad application. However, it also follows from the Code's continued focus on "goods," the definition of which is cast in terms of a "contract for sale," that a contract which calls merely for the rendition of services is not subject to the sales provisions of the Code. 3 R. Duesenberg & L. King, *Sales & Bulk Transfers Under U. C. C.*, § 1.03[1] (1966); 1 R. Anderson, *Anderson on the Uniform Commercial Code*, §§ 2–102:5, 2–105:10 (2d ed. 1970). *See also Computer Servicenters, Inc. v. Beacon Manufacturing Company*, 328 F.Supp. 653, 655 (D.S.C.1970), *aff'd*, 443 F.2d 906 (4th Cir. 1971).

■■ Therefore, the fact that the party supplying a service does so in conjunction with the delivery of goods does not necessarily mean that the transaction comes within the Code. 3 R. Duesenberg & L. King, *Sales & Bulk Transfers Under U. C. C.*, 1–23 (1966). Likewise, although the definition of goods includes goods that have been specially manufactured, "[n]ot all contracts for special manufacture qualify as contracts for the sale of goods under the Uniform Commercial Code." *Curtis Publishing Company v. Sheridan*, 53 F.R.D. 642, 644 (S.D.N.Y.1971). We conclude that, even in the context of a contract for special manufacture, initial inquiry should focus not on the fact of special manufacture, but on whether the contract is one for the sale of goods or one for the rendition of services.

*Curtis Publishing* involved a contract for the printing of a book by Curtis for Commemorative Publications, Inc. The paper used in printing the book was supplied by Curtis, but it was Commemorative that engaged photographers and writers and made all other necessary preparation for producing the book. The book binding was a separate operation performed by another company. In a breach of contract action brought by Curtis, the district court deemed facts concerning the supply of materials, the functions of printing and binding, and the arranging for other services necessary to the publication of the book as relevant in making a determination that the contract was one for services and not a sale of goods. Prefacing its analysis of the contract in

---

**3.** The use of the term transaction rather than sale in U.C.C. § 2–102 is significant in that it makes clear that the reach of Article 2 goes beyond those transactions where there is a transfer of title. Thus, Article 2 sections have been applied in decisions involving transactions that are not sales, but which are used as substitutes for a sale or which have attributes analogous to a sale, such as leases, bailments, or construction contracts. 1 R. Anderson, Anderson on the Uniform Commercial Code. § 2–104:4 (2d ed. 1970); 3 R. Duesenberg & L. King, Sales & Bulk Transfers Under U.C.C., § 1.03[4] (1966). *See e. g., Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House,* 59 Misc.2d 226, 298 N.Y.S.2d 392 (1969).

light of the above factors, the court noted that the mere fact a contract involved special manufacture did not preclude further examination of it to determine whether the contract actually involved a sale of goods under the Code. *See For Children, Inc. v. Graphics International, Inc.*, 352 F.Supp. 1280 (S.D.N.Y.1972). *See also Wm. H. Wise & Co. v. Rand McNally & Co.*, 195 F.Supp. 621 (S.D.N.Y.1961).

■ In this case, 10–X agreed to "cut, make, and finish" for Wells 550 dozen hunting shirts. While 10–X was to furnish the thread, all other materials involved in the production of the shirt were to be provided by Wells. Wells was in all other respects responsible for the design and development of the shirt.

Irrespective of the fact that performance under the terms of the contract would have resulted in the special manufacture of goods, the contract was one for the rendition of services. The language used in the contract clearly bespeaks the intention of the parties that 10–X's obligation under the contract was essentially to provide the manpower and machine capabilities for production of the hunting shirt. That the only material supplied by 10–X in the entire production process was thread is a factor to be considered in characterizing the contract one for services rather than goods. Finally, we note that the parties are in litigation not on a claim of defective goods, but due rather to a deficient performance of services by 10–X. Viewing the contract in the totality of the circumstances, we conclude it is correctly characterized as a contract for the rendition of services, to which the Code is not applicable.

10–X argues that the failure of the district court to apply Michigan common law to the contract resulted in the ruling against it with regard to liability for breach of contract. To be sure, 10–X does not argue that it was not in breach of contract, nor do we express any doubt that such was the case. In fact, we cannot find a single material term of the contract between Wells and 10–X with which 10–X was in compliance; as the district court aptly observed, the contract "was developing into a full-fledged disaster" when Wells ordered 10–X to cease production of the shirt.

Rather, 10–X argues that the parties mutually rescinded the contract, relieving it from any liability on the contract. 10–X points out that the district court stated in its conclusions of law that the parties mutually rescinded the contract on August 15, 1973. However, 10–X argues, because the court went on to apply U.C.C. § 2–720,[4] which represents a substantial change from the common law in the area of rescission of contracts, it erroneously concluded that the rescission did not discharge the claim of Wells for damages. 10–X submits that the failure of Wells to reserve expressly his right to recover damages at the time of the rescission, as he was required under the common law of Michigan,[5] foreclosed his right to damages.

On August 15, 1973, Wells and an official of 10–X agreed that further cutting for the shirt would be discontinued and that 10–X would complete only those shirts that had already been cut from the fabric. On September 7, 1973, Wells ordered a complete termination of production. In its opinion, the district court variously referred to those occurrences as mutual rescissions or cancellations of the contract. However, the district court specifically stated, with respect to the actions of Wells on August 15 and September 7, as follows:

> All evidence indicates that the August 15 and September 7 "cancellations" by Wells

---

4. The Michigan adaptation of that Code provision provides:

   **440.2720 Cancellation, rescission, antecedent breach**

   Sec. 2720. Unless the contrary intention clearly appears, expressions of "cancellation" or "rescission" of the contract or the like shall not be construed as a renunciation or discharge of any claim in damages for an antecedent breach.

5. *See McBee Binder Co. v. Fred J. Robinson Lumber Co.*, 267 Mich. 637, 255 N.W. 329 (1934); *Walter-Wallingford Coal Co. v. A. Himes Coal Co.*, 223 Mich. 576, 194 N.W. 493 (1923).

were merely attempts to mitigate his losses on what was developing into a full-fledged disaster. 10–X is thus liable for full contract damages in this case.[6]

In Michigan, the rescission of a contract has been characterized as follows:

"To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. But this by itself would constitute no more than a breach of the contract or a refusal of performance, while the idea of rescission involves the additional and distinguishing element of a restoration of the status quo." 1 Black on Rescission and Cancellations (2d ed.), § 1.

*Vowels v. Arthur Murray Studios of Michigan, Inc.*, 12 Mich.App. 359, 363, 163 N.W.2d 35 (1968); *Wall v. Zynda*, 283 Mich. 260, 278 N.W. 66 (1938). *See also Simpson v. Murphy*, 229 Mich. 449, 453, 201 N.W. 464 (1924). Furthermore, "[i]t is fundamental law that there must be a meeting of the minds not only to make a contract but also to rescind or modify a contract after it has been made." *Wiljamaa v. Board of Education of the City of Flint*, 50 Mich.App. 688, 690, 213 N.W.2d 830, 831 (1973). *See Universal Leaseway System, Inc. v. Herrud & Co.*, 366 Mich. 473, 115 N.W.2d 294 (1962). Additionally, under the law of Michigan a notice to rescind or terminate a contract must be clear and unambiguous, with the unquestionable purpose of insisting on the rescission. *Jack Mann Chevrolet Co. v. Associates Inv. Co.*, 125 F.2d 778, 784 (6th Cir. 1942). "[W]here the conduct of one having

the right to rescind a contract is ambiguous, and it is not clear whether he has rescinded it or not, he will be deemed not to have done so." *Id., quoting 2 Black on Rescission and Cancellation*, § 574 (1937).

It is clear that there was no rescission of the contract by Wells on August 15, 1973, as there was not even a full release by Wells of 10–X from further obligations under the contract, much less a complete abrogation of the contract from the beginning. On that date, the parties agreed that 10–X would complete the manufacturing of those shirts which had already been cut from the fabric. Further, we do not find Wells' actions on August 15 as evidencing an unambiguous intent to rescind the contract.

Wells' instructions to 10–X on September 7, 1973, in no way purport to be a clear and unambiguous expression by Wells to rescind the contract, nor do we find that there was any "meeting of the minds" to that effect. Wells' actions merely indicated his desire to limit further losses on the contract from 10–X's inability to manufacture the shirts. *See generally* 5A A. Corbin, *Corbin on Contracts*, § 1237 (1964).

In that regard, we note that Michigan law requires the injured party, in both contract and tort actions, to make every reasonable effort to minimize damages suffered. *Williams v. American Title Insurance Company*, 83 Mich.App. 686, 697, 269 N.W.2d 481 (1978); *Tel-Ex Plaza, Inc. v. Hardees Restaurants, Inc.*, 76 Mich.App. 131, 134–35, 255 N.W.2d 794 (1977). We agree with the district court that Wells' actions on both August 15, 1973, and September 7, 1973, were attempts to mitigate damages and did not amount to a rescission of the contract under Michigan common law. We conclude that 10–X is liable to Wells for breach of contract for the full measure of damages available under Michigan law.

6. Although not critical to our analysis, it would appear from the juxtaposition of the district court's general references to the events of August 15, 1973, and September 7, 1973, as resulting in a mutual rescission or cancellation of the contract, with his specific conclusion that the "cancellations . . . were merely attempts to mitigate . . . losses," that the district court was not using the terms "rescission" and "cancellation" as words of art.

**V**

The district court awarded Wells $40,292.15 in damages for 10–X's breach of contract. In computing these damages, the district court relied on the formula set out in U.C.C. § 2–713. In light of the decision of this court that the contract was not governed by the Uniform Commercial Code, we conclude that the cause must be remanded to the district court for a determination of damages under the common law of Michigan.

Finally, we agree with the district court that Wells is not entitled to consequential damages for his pre-contractual expenses in the development of the hunting shirt.

The judgment of the district court is affirmed for the reasons herein set forth and the case is remanded for further proceedings not inconsistent with this opinion. Each party will bear its own costs on this appeal.

WILLIAM K. THOMAS, District Judge (concurring).

I concur in the majority's conclusion that the agreement of 10–X to "cut, make and finish" 550 dozen chamois cloth hunting shirts for Wells was one for the "rendition of services . . . to which the Code is not applicable."

In this diversity case, the majority concludes "that the Michigan Supreme Court would not view the contract in this case as coming within the purview of the Code." In reaching this conclusion the majority generally interprets the pertinent sections of the Uniform Commercial Code, there be-

ing no declaration of the Supreme Court of Michigan to "which we can turn in determining whether this type of transaction is within the contemplation of the Code."

While I concur with its result, I believe it is important to separately state why I believe that the Code does not apply to this contract even though, as the majority states, "performance under the terms of the contract would have resulted in the special manufacture of goods."

In determining that there was a "contract for the sale of goods" and "that the contract for the Welmark shirt is governed by the Uniform Commercial Code," the district court called attention to section 2–102,

> Unless the context otherwise requires, this Article applies to transactions in goods,

and to section 2–105(1), which defines "goods" to mean:

> . . . all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale . . . .

The district court then reasoned:

> Not only does the primary definition of goods expressly include "specially manufactured goods," but other sections of the Code detail the relationship between buyers and sellers of specially manufactured goods. See, for example, Section 2–201(3).[1] Commentators agree that the text of the Code as well as its intent cover specially manufactured goods; moreover, no case or commentary has indicated that the furnishing of materials by the buyer in any way affects the ap-

---

1. Section 2–201 in pertinent part provides:

    (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . . .

    \*   \*   \*   \*   \*   \*

    (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

    (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; . . .

plication of the Code. To the contrary, such cases as *Vitromar Piece Dye Works v. Lawrence of London*, 119 Ill.App.2d 301, [256 N.E.2d 135] (1970), extend the ambit of the Code to service-type contracts much less clearly "sales" than the Wells-10X agreement.

Reading section 2–102 in *pari materia* with section 2–105(1), the district court appears to have concluded that a contract for the production of specially manufactured goods is governed by the Code because section 2–102 brings "transactions in goods" within the application of the Code. However, section 2–102 qualifies the application of the Code to "transactions in goods" by specifying "unless the context otherwise requires." I conclude that the context of this transaction does otherwise require as later discussion shows. Further limiting the term "transaction in goods" is that the "goods (including specially manufactured goods)" must be identifiable to "the contract for sale." Hence, only contracts for sale of specially manufactured goods would qualify as "transactions in goods" under sections 2–105(1) and 2–102.[2]

Moreover, while the term is not expressly defined in the Code, "specially manufactured goods" must possess the conditions, clearly indicative of a contract for sale, which are specified in section 2–201(3)(a) of the Statute of Frauds provision of the Code. The "goods" must be "specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business."

This language of section 2–201(3)(a), revising similar language of the Statute of Frauds provision of the Uniform Sales Act,[3] had its origin in the Massachusetts Rule, which, rather than the English Rule or the New York Rule, was adopted as the American Rule. For full discussion see section 2.02[4] Specially Manufactured Goods, Duesenberg & King, Vol. II, pp. 25–27 (1978), Bender's Uniform Commercial Code Service.[4]

The previous analysis of sections 2–102, 2–105(1), and 2–201(3)(a) tested against the sense of the commentary in the margin leads to these rules. A contract for specially manufactured goods is a term of art that provides for the production of goods by rendition of services and for the sale of those goods. Because of the sales component, it is treated as a contract for sale of goods subject to the other provisions of the Code, but excepted from the Statute of Frauds by section 2–201(3)(a).

On the other hand, a contract that provides for the production of specially manufactured goods but not for the sale of those

---

**2.** However, as the majority states in n. 3, "Article 2 sections have been applied in decisions involving transactions that are not sales, but which are used as substitutes for a sale or which have attributes analogous to a sale, such as leases, bailments, or construction contracts."

**3.** Section 4(2) of the Uniform Sales Act provided:

.  .  .  but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section [Statute of Frauds] shall not apply.

**4.** In an in-depth discussion of "specially manufactured goods," Duesenberg & King begin by observing that the exception to the Statute of Frauds of contracts for specially manufactured goods is "an application of the rule that contracts for work and labor are not within the statute." From this beginning, the authors use the term contract for service or contract for work and labor as an alternate meaning for a contract for specially manufactured goods. Under the Uniform Sales Act, the authors label such contracts as mixed contracts for service as well as for the sale of goods, but "such a contract is classified as one either for the sale of goods or for work and labor in assessing its provability under the Statute of Frauds." Perpetuation of this pre-code attitude, in the minds of the authors, has this "solid justification":

Though the historical antecedent of the rule was the distinction between sales and service, its contemporary apology is that the special manufacture seller is deserving of greater protection than his non-special manufacturer counterpart. This is because without the rule he might find himself unable to dispose of the goods he has manufactured, or has had manufactured by another party. *Id.* at 2–30.

goods is a contract for work and labor.[5] As a contract for work and labor it is not a contract for sale and therefore it is not within the provisions of the Code. As a contract for work and labor it is also outside the Statute of Frauds.

The majority stresses that "10–X agreed to 'cut, make, and finish' for Wells 550 dozen hunting shirts," and that except for the thread furnished by 10–X, "all other materials involved in the production of the shirt were to be provided by Wells." The words "cut, make, and finish" appear in two letters exchanged between William P. Wells and president Blume of 10–X, which letters are part of the contract. On May 10, 1973, Wells wrote Blume, in part, "Our immediate requirements are cut, make and finish of approximately 550 dozen shirts." The shirts were to be "made of a 9-ounce woven double-napped cotton suede, known also as chamois cloth or moleskin." He went on to say that "these are to be quality shirts, made according to our sample and specifications." Responding with a quote "on your needs for the chamois cloth shirts for this year," Blume told Wells:

> Your cost for us to cut, make, and finish including thread and freight from our Des Moines plant would be $3.30 per unit complete.

Although finished hunting shirts were the intended end products of the contract, it was the labor and not the end product that was purchased. As the majority states, the contractual language

> . . . bespeaks the intention of the parties that 10–X's obligation under the contract was essentially to provide the manpower and machine capabilities for production of the hunting shirt.

The contract item "3.30 per unit complete" fixed a per-unit cost of labor as the contract price. It did not specify a unit sale. Moreover, since the shirt materials, except for the thread, originated with Wells, it can hardly be said that Wells was buying shirts and not services from 10–X.

Thus the contract called for manufacturing services to produce specially manufactured goods, but a sales component was lacking. Within the above-formulated rules relating to "specially manufactured goods," the contract is determined to be for work and labor. As such, as the majority concludes, it is not within the Code.

---

5. It is this type of contract that it is understood that the majority is describing when it says that "performance under the contract would have resulted in the special manufacture of goods."