**JACKSON HOLE TRADERS, INC., a Wyoming Corporation; David W. Speaks; and Elizabeth Speaks, Appellants (Defendants),**

v.

**Catherine JOSEPH d/b/a Metro Classics, Appellee (Plaintiff).**

No. 96–58.

Supreme Court of Wyoming.

Jan. 28, 1997.

James K. Lubing of Law Office of James K. Lubing, Jackson, for Appellants.

Kenneth S. Cohen, Jackson, for Appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

MACY, Justice.

Appellants Jackson Hole Traders, Inc., David Speaks, and Elizabeth Speaks appeal from the judgment which was entered in favor of Appellee Catherine Joseph, who was doing business as Metro Classics.

We affirm in part and reverse in part.

## ISSUES

Appellants present the following issues for our review:

I. Did the trial court violate [Appellants'] due process rights by disallowing them an adequate opportunity to defend [Appellee's] lawsuit?

II. Did the trial court err when it concluded, as a matter of law, that the Uniform Commercial Code applied to the contracts between the parties when the contracts were for labor and services and not goods?

III. Did the trial court err when it determined, as a matter of law, that [Appellants] David W. Speaks and Elizabeth Speaks were individually liable for the debts of their corporation when the trial court made no findings to support such a conclusion, and the evidence at trial was to the contrary?

## FACTS

The trial court summarized the evidence in its findings of fact and conclusions of law. We quote from the relevant portions of the judgment:

1. [Appellee] does business as Metro–Classics, and she is a resident of the state of New York. [Appellee] designs and manufactures men's and women's clothing.

2. In the manufacturing process [Appellee] makes some of the clothing herself, but on large orders subcontracts various steps in the manufacturing process, including grading of patterns, cutting, and sewing.

3. [Appellant] Jackson Hole Traders, Inc., is a Wyoming corporation and [Appellants] David W. Speaks and Elizabeth Speaks are corporate officers and apparently share holders.

4. [Appellants] operate[ ] a clothing store in Jackson, Wyoming known as Jackson Hole Traders, which sells clothing for men and women through a retail store and through a mail-order catalogue business.

. . . .

6. [Appellants] from time to time hire clothing manufacturers to manufacture clothing to sell in their store and through their mail-order catalogue.

7. In 1993 [Appellants] contracted with [Appellee] to design and/or manufacture clothing to sell in their store, and this was accomplished by [Appellee] to the mutual satisfaction of the parties.

8. In the Spring of 1994, [Appellants] and [Appellee] discussed a large order of clothing to be manufactured by [Appellee].

9. Pursuant to these discussions, [Appellee] had a pattern maker work on the patterns and [Appellee] manufactured certain samples of about fourteen different styles, which samples were used by models for [Appellants] and photographed for a Fall/Winter catalogue on or about May 20, 1994.

10. On or about May 24, 1994, [Appellant] Elizabeth Speaks called [Appellee] on the telephone, and during an approximately sixty-seven minute phone conversation, tentative quantities of clothing items were discussed. [Appellee] was to supply certain fabric for some of the clothing and [Appellants] were to order and supply the remaining fabric.

11. In early March, 1994, [Appellants] placed an order for several hundred yards of fabric from Woolrich to be used in the manufacture of clothing by [Appellee]. [Appellants] failed and refused to provide sufficient financial background information for Woolrich to immediately extend to them credit. Several weeks of correspondence and exchange of information occurred, delaying the shipping of the Woolrich fabric to [Appellee] by approximately six weeks.

12. During the telephone conversation of May 24, [Appellee] and Elizabeth Speaks discussed fitting of the patterns, changes to the patterns and quantities of clothing.

13. [Appellee] thereafter initiated a credit check of [Appellants] and on or about June 10, 1994, [she] went to her banker to secure a $50,000.00 loan to be used to produce the clothing for [Appellants] and other customers. At that time [Appellee] had nothing in writing from [Appellants] and her bank required her to obtain the same.

14. [Appellee] informed [Appellants] that she would require their orders to be in writing and on or about June 21, 1994 [Appellants] caused written purchase orders to be communicated to [Appellee] for approximately nine hundred items of clothing to be manufactured by [Appellee]. One purchase order recited a cancellation date of July 30, 1994, and the remaining orders specified August 15, 1994. There were five purchase orders in all.

15. It is customary in the clothing business for delivery dates of clothing for the Fall season to be made from July through the end of September. Up until the point that the written purchase orders had been transmitted to [Appellee], there had been no discussion between [Appellee] and [Appellants] with regard to cancellation or delivery dates.

16. A cancellation date in an order is a date specified by the parties, and if the order is not delivered by that date, the purchaser has the option of returning the goods and cancelling the order or negotiating other terms.

17. When [Appellee] received the five purchase orders with the cancellation date[s] she spoke on the telephone with [Appellant] Elizabeth Speaks and advised her that she could not meet those cancellation dates. [Appellant] Elizabeth Speaks agreed to move each of the dates by fifteen days. [Appellee] informed her that it would be helpful but she could not get all of the items there by August 30, 1994. [Appellant] Elizabeth Speaks by her own admission told [Appellee] to "do the best you can." Thereafter the parties understood that the cancellation date of August 30, 1994 could not be met by [Appellee].

18. [Appellee] testified that it takes her approximately ten to twelve weeks from the time something is ordered to go through the entire process through production.

19. During the production of the clothing by [Appellee] she experienced some problems with some of the Woolrich fabric

known as Blue Ombre, which was a plaid pattern, and which during the mass production of the cutting process, produced problems in lining up the lines on the plaid fabric at the seams. [Appellee] communicated this problem to [Appellant] Elizabeth Speaks during the production process and was told to do the best she could.

20. The first shipment of clothing to [Appellants] from [Appellee] went out on July 18, 1994 and shipments continued thereafter through the end of October, 1994. Part of these items of clothing delivered were a supplemental holiday order which was placed after the initial order by [Appellants] with [Appellee].

21. [Appellee] submitted her bills to [Appellants] in the form of invoices, the terms of which were "Net 30," which meant that the goods were to be paid for within thirty days. This is a standard in the clothing industry.

22. All of the goods shipped through the end of August, 1994 by [Appellee] to [Appellants] were paid for on an untimely basis, that is at least six weeks late.

23. [Appellee's] exhibits 18 through 33[ ] are for invoices for clothing shipped after September 1, 1994, none of which have ever been paid for by [Appellants], and which total $33,101.61 for goods shipped to [Appellants] from September 7, 1994 through October 31, 1994.

24. Some of the items of clothing were returned by [Appellants] to [Appellee], and [Appellants] are entitled to a credit of $1,096.00 for the returned merchandise, and after all just credits there still remains a sum of $32,005.61 owing to [Appellee] by [Appellants].

. . . .

29. [Appellants] notified [Appellee] of certain problems on a timely basis, for which [Appellants] should receive credit in the amount of $1,096.00.

30. After not having been paid for approximately $33,000.00 of merchandise well beyond the Net–30–Day period, [Appellee] began making contacts with [Appellants] to obtain payments.

31. [Appellee] was given the "telephone run-around" any time she tried to contact [Appellant] David W. Speaks, who was in charge of paying the bills for the . . . corporation. Mr. Speaks was seldom there and the people answering the phone always told [Appellee] that he would return her calls. He never did.

32. On December 9, 1994, [Appellee] hired counsel and contacted [Appellants] to seek payment. After that contact, [Appellants] caused the remaining merchandise they had in their possession which had been manufactured by [Appellee] to be packaged up and shipped to [Appellee]. [Appellee] refused to accept the same and they have been returned to [Appellants].

33. This case in its essence can be summarized as follows: Approximately nine hundred articles of clothing were manufactured by [Appellee] and shipped to [Appellants]; [Appellants] inventoried these items and took them into their possession, placed them on the retail sales floor and sold them and also placed them in their warehouse and sold them from their catalogue; [Appellants] sold approximately seventy percent of the items manufactured; [Appellants] have not paid for a substantial portion of the items; when pressed for payment [Appellants] have tried to ship the goods back and have tried to assess a two percent per month late penalty against [Appellee] for approximately $30,000.00.

. . . .

35. [Appellants] accepted shipment of all of the merchandise with the previous mentioned exceptions, kept it in their possession for two to three months and never complained about late delivery or defective merchandise. They cannot be heard to complain about that now.

. . . .

39. [Appellee] has billed [Appellants] the sum of $51,171.79 for clothing manufactured by her for [Appellants] at their request. The sums billed to [Appellants] were in accord with the per article cost agreed to by the parties prior to the manufacture of these items.

40. [Appellants] made partial payments to [Appellee] from time to time in August,

September and October, 1994 totalling $18,070.18. [Appellants] also seasonally returned several articles of clothing for which they are entitled to a credit in the sum of $1,096.00. After all just credits and allowances [Appellants] owe [Appellee] the sum of $32,005.61 and have owed that to her since thirty days after the last invoice was sent. Interest has accrued on the unpaid invoices per the agreement of the parties at 1.5 percent per month, and accrued interest through November 2, 1995, was in the amount of $5,958.00.

41. The Uniform Commercial Code provides for buyers' rights on improper delivery. In such event the buyer may: (1) reject the whole; (2) accept the whole; or (3) accept any commercial unit or units and reject the rest. § 34.1–2–601 W.S.1977 (1991 comp). In this case with the exception of the rejection of goods for which [Appellants] have received credit, they accepted the entire remainder of the goods.

42. [Appellants'] attempted rejection of the goods in December was not timely as required by § 34.1–2–602 W.S.1977 (1991 comp).

43. [Appellants] accepted the goods, as that term is defined in § 34.1–2–606 W.S. 1977 (1991 comp), in that after reasonable opportunity to inspect the goods, they did not notify the seller of any non-conformity.

44. [Appellee] is entitled to judgment against [Appellants] in the principal sum of $32,005.61, accrued interest in the amount of $5,958.00, accruing interest and costs of suit.

## DISCUSSION

### A. Due Process Claim

In their first claim of error, Appellants assert that the trial court violated their right to be heard when it did not allow them to have an adequate opportunity to present their defense. Appellee argues that Appellants were afforded the opportunity to be heard in a meaningful manner.

"[D]ue process must be afforded to litigants in the form of notice and a meaningful opportunity to be heard." *Lawrence–Allison and Associates West, Inc. v. Archer,* 767 P.2d 989, 997 (Wyo.1989). "A meaningful opportunity to be heard necessarily requires a hearing involving elements of formality and procedure dependent upon 'the importance of the interests involved and the nature of the subsequent proceedings.'" *Id.* (quoting *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)).

At various times throughout the trial, the trial court and the parties discussed how much time each side would need for its case. Appellants informed the trial court that they did not think that they would need more than "two to three hours, maximum" in which to present their case. The trial court scheduled its time accordingly. Then, with full knowledge of the limitations which the trial court intended to impose, Appellants requested a recess late in day two of the trial instead of continuing on as long as the trial court would allow on that day. At that time, the trial court informed Appellants that only three hours would be allotted to this case on day three.

We are somewhat puzzled about Appellants' complaint because they were given more than the "two to three hours, maximum" which they had informed the trial court that they would need in order to fully present their case. Equally confusing is the fact that Appellants chose to wait until late in day three to call their most important witness when they knew that her time would be limited. Furthermore, when Appellants realized that their case was taking longer than they had expected, they did not request more time.

Appellants do not point us to any authority which prohibits trial courts from limiting parties to the amounts of time that they specified they would need to fully present their cases. The trial court in this case did not arbitrarily limit the substance of the evidence which Appellants wanted to present; it merely limited the time in which they were allowed to present it to the amount of time which they had indicated that they thought would be sufficient. Appellants' decisions to recess on day two and to put on their most important witness late in day three were decisions they made knowing that the trial court would give this case only three hours

on day three in which to be completed. We will not excuse Appellants from those decisions under the guise of a due process violation.

■ Even if we were convinced that the trial court erred by limiting the time frame in which Appellants had to present their case, we would find that the error was harmless because Appellants have failed to explain what evidence they would have presented had they been given more time and why such evidence was important to their case. *See Pure Gas and Chemical Company v. Cook*, 526 P.2d 986, 992 (Wyo.1974). Appellants invite us to review the record in its entirety in order to get an overall impression of how their case was compromised by the time limitation. We have reviewed the entire record, and we do not see any reason why Appellants needed more time. The witnesses' testimony was surprisingly uncontested. We conclude from reviewing the record, without having the benefit of an explanation to the contrary, that the trial court had a complete version of the facts before it when it made its decision.

## B. Uniform Commercial Code

■ Appellants claim that the trial court improperly concluded that the Uniform Commercial Code governed the parties' transaction, arguing that this transaction was principally one for labor and services. Appellee counters that the trial court appropriately applied the Uniform Commercial Code to this transaction because it was for the sale of goods.[1]

For support of their proposition that this transaction was one for services rather than for goods, Appellants rely on *Wells v. 10–X Manufacturing Company*, 609 F.2d 248 (6th Cir.1979). That case, however, differs from the case at bar because the buyer in *Wells* furnished the manufacturer with virtually everything but the labor:

In this case, 10–X agreed to "cut, make, and finish" for Wells 550 dozen hunting shirts. While 10–X was to furnish the thread, all other materials involved in the production of the shirt were to be provided by Wells. Wells was in all other respects responsible for the design and development of the shirt.

. . . The language used in the contract clearly bespeaks the intention of the parties that 10–X's obligation under the contract was essentially to provide the manpower and machine capabilities for production of the hunting shirt. That the only material supplied by 10–X in the entire production process was thread is a factor to be considered in characterizing the contract one for services rather than goods.

*Wells*, 609 F.2d at 255.

Although Appellants purchased and supplied the outer fabric for some of the garments produced by Appellee, Appellee supplied all the other materials which were used to manufacture the garments; i.e., buttons, linings, interfacing, special care labels, as well as the outer fabric for the remaining garments. Some garments were patterned from Appellee's own designs. Even for those styles which utilized a design provided by Appellants, Appellee and her pattern maker had to restyle them because of various changes which were requested by Appellants. Each pattern was then graded into the particular sizes to be used for that garment. Under the facts of this case, the trial court correctly applied the Uniform Commercial Code as this transaction was one for the sale of goods even though labor was involved in producing the goods.

■ Even if the Uniform Commercial Code did not apply to this transaction, Appellants would still owe Appellee the amount which was determined by the trial court. "A breach of contract is a failure without legal excuse to perform any promise which forms a

---

1. The relevant statute provides:
   **§ 34.1–2–102. Scope; certain security and other transactions excluded from this article.**
   Unless the context otherwise requires, this article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or

present sale is intended to operate only as security transaction nor does this article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers.
Wyo. Stat. § 34.1–2–102 (1991).

whole or a part of a contract." *Sagebrush Development, Inc. v. Moehrke,* 604 P.2d 198, 201 (Wyo.1979).

> "The measure of damages for breach of contract is that which would place plaintiff in the same position as he would have been had the contract been performed, less proper deductions. In other words, it is that which will compensate him for the loss which full performance would have prevented or breach of it entailed."

*Id.* (quoting *Reynolds v. Tice,* 595 P.2d 1318, 1323 (Wyo.1979)).

Appellee shipped approximately 900 garments to Appellants between July 18, 1994, and the last week of September 1994 plus an additional "holiday" order during the last week of October 1994. Of the 900 garments, Appellants properly rejected ten vests and four coats, returning these garments to Appellee in early October. Appellee gave them a credit for these items. Appellants kept all the other goods until mid-December 1994 when Appellee demanded that Appellants pay the remaining $32,000 which they owed to her. In response to that demand, Appellants packed up 350 garments and shipped them back to Appellee. David Speaks gave the following testimony with regard to Appellants' response to Appellee's demand:

[APPELLEE'S ATTORNEY:] Now, I sent you a letter dated December 9 asking for thirty-two thousand dollars for [Appellee], did I not?

A. Yes, you did.

Q. And your response was to pack up 350 garments that she had manufactured at your request and ship them back in bulk to her, wasn't it?

A. That's what we did, yes.

. . . .

[Q.] Now, the goods that you shipped back to [Appellee], you instructed—either you or Ms. Speaks instructed someone working for you to take the goods off of the showroom floor and box them up and send them back. Some of the goods that were returned to [Appellee] were pulled off the s[h]owroom floor, weren't they?

A. Most likely, yes. I'm almost positive, yeah.

Q. And some of those items were pulled off the shelves where they had been stored for several months, weren't they?

A. You're talking about in the warehouse?

Q. Yes.

A. Yes, they were.

. . . .

Q. If you don't think the goods got there on time and you think that you have been put in a bad way as a result of that, you can refuse the shipment, can't you?

A. You can refuse the shipment, yes, you can. That is one option.

Q. And you could have done that, couldn't you?

A. That's an option, yes.

Q. But you didn't refuse the shipment, did you?

A. No, we did not.

Q. And you put the goods in your warehouse, didn't you?

A. Yes, they were in the warehouse.

Q. And put them on your showroom floor, didn't you?

A. Yes, we did.

Q. And you sold them through your catalog; is that right?

A. Yes, we did.

Q. And you sold many of them in your store, didn't you?

A. Yes, we did.

. . . .

[Q.] When I sent you the letter on December 9th asking for payment of the thirty-two thousand plus dollars owed to [Appellee], your response within 72 hours was to take everything and ship it back to [Appellee]; is that correct?

A. Yes, it was.

Appellants breached the contract when they failed to pay for the garments which had been sent to them and which they had accepted for resale. The trial court properly awarded damages in an amount which would place Appellee in the same position that she would have occupied had the contract been performed.

## C. Corporate Veil

Appellants contend that the trial court improperly pierced the corporate veil of Jackson Hole Traders, Inc. when it entered a judgment against David Speaks and Elizabeth Speaks personally. Appellants maintain that the record is completely devoid of any evidence which would support this finding. Appellee does not address this issue in her brief.

Before the corporate veil can be pierced, the evidence must demonstrate that

the corporation is not only influenced and governed by [a particular] person, but that there is such a unity of interest and ownership that the individuality, or separateness, of [such] person and corporation has ceased; [and] that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

*Minifie v. Rowley,* 187 Cal. 481, 202 P. 673, 676 (1921). *See also Miles v. CEC Homes, Inc.,* 753 P.2d 1021, 1023 (Wyo.1988); *Amfac Mechanical Supply Co. v. Federer,* 645 P.2d 73, 77 (Wyo.1982).

We agree with Appellants that the record does not contain any evidence to support the trial court's decision to pierce the corporate veil. Additionally, during Appellee's oral argument to this Court, she conceded this issue. We, therefore, reverse that portion of the trial court's judgment which pierced the corporate veil of Jackson Hole Traders, Inc. and found David Speaks and Elizabeth Speaks personally liable for the amount of the judgment.

## CONCLUSION

The trial court afforded Appellants a meaningful opportunity to be heard and that it properly applied the Uniform Commercial Code to the facts of this case. Sufficient evidence, however, did not support the trial court's decision to pierce the corporate veil of Jackson Hole Traders, Inc.

Affirmed in part and reversed in part.