**BATTELLE MEMORIAL INSTITUTE,
Plaintiff,**

v.

**NOWSCO PIPELINE SERVICES, INC.,
Nowsco Well Service, Ltd., and BJ
Services Company, Defendants.**

**No. C2–97–955.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 18, 1999.

John Hamrick Burtch, Baker & Hostetler, Columbus, OH, Dennis Joseph McCann, Columbus, OH, for Battelle Memorial Institute.

David Warren Alexander, Squire, Sanders & Dempsey, Columbus, OH, for Nowsco Pipeline SCV, Nowsco Well Service Ltd.

David Warren Alexander, Squire, Sanders & Dempsey, Columbus, OH, James N. Riley, Brian D. Morrison, Catherine D. Munster, McNeer, Highland & McMunn, Clarksburg, WV, for BJ Services Co.

## *OPINION & ORDER*

MARBLEY, District Judge.

This cause comes before the Court on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Declaratory Judgment. For the following reasons, Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part; Defendant's Motion for Declaratory Judgment is **DENIED**.

## I. FACTS

Plaintiff Battelle Memorial Institute ("Battelle") is a not-for-profit corporation, organized under the laws of Ohio, which operates a testing facility for performing scientific research and development for

government and industrial clients. One of Battelle's operations is a research facility known as the Gas Research Institute Pipeline Simulation Facility ("GRI/PSF"). The GRI/PSF includes an underground pipeline (the "Flow Loop"), which simulates pipelines used in the gas transmission industry. Among other things, the Flow Loop is used for the testing of magnetic flux leakage tools (commonly referred to in the pipeline business as "MFL pigs"). These "pigs" are designed to detect leaks and corrosion in oil and gas pipelines.

Defendants Nowsco Pipeline Services, Inc. and Nowsco Well Services are organized under the laws of States other than Ohio, and are in the business of providing services related to gas wells and pipelines. This includes equipping oil and gas companies with MFL pigs. Both parties agree that Defendant BJ Services Company, a Delaware corporation, is Nowsco's successor in interest. All Defendants will be referred to collectively as "Nowsco" for the purposes of this opinion.

In May, 1994, Nowsco and Battelle entered into a business relationship. The contractual arrangement between the parties was comprised of three sets of documents. First, in May of 1994, the parties entered into a contract captioned Task Order Number CP024467 ("Task Order") which provided for the testing of Nowsco's prototype pig in Battelle's GRI/PSF facility. Second, by letters written in the fall of 1995 between officers of the respective companies, the parties agreed that the testing of Nowsco's pig at the Battelle test facility would be conducted pursuant to Task Order Number CPO24467, even though a more recent Task Order had been executed.[1] Third, in October of 1995, just before the commencement of the pig testing, Battelle entered into four separate contracts with Nowsco and four of Nowsco's individual employees: Jim Smith,

Greg Brown, Rod Clifford and Rob Eneson. Each contract was labeled an "Access Agreement" and was a three-way contract between Battelle, Nowsco and the individual who was going to be at the GRI/PSF facility to participate in the project. These three contracts are the sum of the parties' agreements; the Court's opinion will be based almost entirely on the interpretation of these documents. The Court has conducted a careful examination of these papers.

While the contracts must, of course, be examined in their entirety, there are two key provisions related to this dispute. First, Paragraph 6 of the Task Order Agreement provides:

> CLIENT [Nowsco] agrees to indemnify and hold BATTELLE harmless from any and all liability, claims, demands, damages, and all costs and expenses in connection therewith, for or arising out of BATTELLE's performance under this agreement, except for injury or damage directly resulting during performance of the agreement activities on BATTELLE-owned premises where fault of CLIENT is not a contributing cause of such injury or damage. BATTELLE PROVIDES NO WARRANTY OR GUARANTY OF RESULTS, INCLUDING WARRANTIES OF FITNESS FOR PURPOSE OR OF MERCHANTABILITY FOR ANY ITEM OR RESEARCH RESULT WHICH MAY BE DELIVERED UNDER THIS AGREEMENT. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

Second, Paragraph 6 of each Access Agreement contains the following provision:

> CP024467; both parties now agree that Task Order CP024467 regulated the testing at issue. Task Order CP028916 is thus irrelevant to this case.

---

1. The parties also had entered into a contract entitled Task Order Agreement Number CP028916 in September of 1995. The parties resolved, however, that the testing of the MFL pig would be controlled by Task Order

COMPANY [Nowsco] and PARTICIPANT agree, for themselves and for their successors and assigns, and heirs and administrators, to release, indemnify and hold harmless BATTELLE and GRI, their divisions, affiliates, officers, trustees, agents and employees, from all liability, damages, claims, suits or other consequences (including but not limited to personal injury or death) caused by or arising out of this Agreement and the access granted thereby.

These two provisions govern the allocation of risk between Battelle and Nowsco for the Flow Loop experiments.

On October 12, 1995, the testing of Nowsco's MFL pig at Battelle's GRI/PSF facility commenced. Nowsco representatives were present at the site. Sixteen test runs were completed without problems or complications. During the seventeenth test run, the pig became lodged in the Flow Loop. Nowsco's representatives introduced a second pig, called a "pusher pig," into the Flow Loop to dislodge the stuck pig. Both pigs were designed and built by Nowsco. As the pusher pig began moving the first pig, a fire ignited in the pipeline, explosively rupturing the Flow Loop and ejecting both pigs. The explosion caused severe damage to the Flow Loop and completely destroyed the pigs.

## II. PROCEDURAL POSTURE

On August 27, 1997 Battelle filed suit against Nowsco Pipeline services, Inc., Nowsco Well Service, Ltd., and BJ Services Company. On September 8, 1997 Battelle filed its Amended Complaint against Nowsco for negligence (Count I), breach of implied warranty (Count II) and breach of written contract (Counts III and IV, addressing damages to the Flow Loop and the contractual fees due for services provided, respectively). Additionally, in Count V of its Amended Complaint, Battelle requests declaratory relief from Nowsco's counterclaims pursuant to 28 U.S.C. § 2201(a). Battelle claims it was released from liability to Nowsco for any damage arising from the loss of the pigs pursuant to the terms of the Task Order and Access Agreements. Nowsco filed its Answer and Counterclaim on October 10, 1997, claiming damages for the loss of its MFL pigs under theories of negligence (Count I), breach of warranty (Count II) and breach of contract (Count III).

Now, Battelle moves for summary judgment on Count V of its Amended Complaint and Counts I, II and III of Nowsco's Counterclaim. Similarly, Nowsco has filed a "Motion for Declaratory Judgment on the Contract," with respect to Counts III and V of Battelle's Amended Complaint. These two Motions raise the same basic issues.

### A. Battelle's Motion for Summary Judgment

Battelle moves for summary judgment on Count V of its Amended Complaint and Counts I, II, and III of Nowsco's Counterclaim. Battelle advances four basic arguments in its Motion for Summary Judgment. First, Battelle argues that the Access Agreements prevent Nowsco from holding Battelle liable for the damage resulting from the use of the Flow Loop. Battelle points to the clause in which Nowsco agrees to release, indemnify, and hold Battelle harmless from all liability arising out of the Access Agreement, or the access granted thereby. Second, Battelle contends that the Task Order prevents Nowsco from holding Battelle liable for damage resulting from the use of the Flow Loop, because of the "hold harmless" provision in Paragraph 6. Battelle asserts that it is "uncontroverted that the fire that caused the explosion in the Flow Loop was started by Nowsco's pigs." Third, Battelle argues that Nowsco may not recover damages under a breach of warranty theory, because Battelle excluded all warranties in its disclaimer in Paragraph 6 of the Task Order. Finally, Battelle maintains that, under Ohio law, Nowsco may not recover damages under tort theories of negli-

gence, but may only sue under the law of contracts.

## B. Nowsco's Motion for Declaratory Judgment on the Contract

Nowsco requests a declaratory judgment with respect to Counts III and V of Battelle's Amended Complaint; Nowsco asks that this Court find: (1) that Nowsco did not breach any written contract between the parties; (2) Nowsco is not liable to Battelle under the contracts; and (3) the contracts between the parties do not preclude Nowsco from maintaining a claim against Battelle for damages to Nowsco's pigs. In support of this Motion, Nowsco puts forth three essential arguments. First, Nowsco argues that the "indemnification" language in the Task Order applies only to damages to *third parties*, not to damage as between the two contracting parties. Second, Nowsco claims the Access Agreements were intended to apply only to those risks associated with allowing employees to have access to Battelle's property, not for damages caused by the testing itself. Third, Nowsco argues that the contracts between the parties do not preclude Nowsco from bringing a claim against Battelle for damages to the pig arising from Battelle's alleged misconduct.

As a procedural matter, Battelle argues that declaratory judgment is not the proper vehicle to obtain the relief sought by Nowsco, and treats Nowsco's Motion as one for summary judgment. Both parties are asking this Court for the same essential relief: declarations on the state of the law of this case.

## III. SUMMARY JUDGMENT & DECLARATORY JUDGMENT STANDARDS

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995).

Finally, 28 U.S.C. § 2201 governs declaratory judgments. The statute provides:

... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further

relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(A). This section is an enabling act which confers a discretion on the courts rather than an absolute right upon the litigant. *See Zemel v. Rusk,* 381 U.S. 1, 18, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

## IV. LAW and ARGUMENT

Having reviewed the relevant contracts as well as the parties' briefs, the Court has arrived at a few essential conclusions about the law of this case; these determinations will resolve all of the issues raised by the parties' pending Motions.

### A. The Task Order Governs the Allocation of Costs from the Accident

First, the Court finds that the Task Order is the contract governing the actual testing in the Flow Loop, while the Access Agreements merely concern the admission and presence of Nowsco employees on Battelle's property during the testing. A plain reading of these contracts supports this view.

The Task Order states in its preamble that its terms will apply to "the following research investigation: technical and research services through individual tasks as mutually agreed in writing." The Task Order goes on to set forth various conditions by which the parties agreed to abide in conducting their business with regard to future research projects. This agreement thus covers research and testing activities Nowsco might perform at Battelle's facility. Conversely, the Access Agreements specifically limit themselves to covering the subject matter related to the *access of certain individuals* on Battelle's property during a specific testing period. The Access Agreement preamble states:

> WHEREAS, the parties to this Agreement desire that the PARTICIPANT be given access to the Gas Research Insti-

tute (hereinafter called GRI) Pipeline Simulation Facility (hereinafter called GRI PSF) only for the purpose of: observing and collecting data related to the testing of an inline inspection tool and/or an inline sensor in the GRI PSF pull rig and flow loop. . . .

This language explicitly limits the terms of the Access Agreements to the access and presence of Nowsco employees on Battelle's facility. Indeed, the subsequently listed terms of the Access Agreement include: definition of the dates and purpose of access, the name of the person in control of Nowsco employees while on site, acknowledgment by Nowsco of its responsibility for its employee's payroll type expenses and liabilities (like worker's compensation and unemployment benefits), details of a non-disclosure agreement, and the participant's agreement to observe and conform to Battelle's rules such as guidelines for access, health, safety and security. All of these terms pertain to the presence of Nowsco employees on the Battelle facility, not for the actual testing in the Flow Loop.

Finally, Paragraph 6 of the Access Agreements provides:

> COMPANY [Nowsco] and PARTICIPANT agree, for themselves and for their successors and assign, and heirs and administrators, to release, indemnify and hold harmless BATTELLE and GRI, their divisions, affiliates, officers, trustees, agents and employees, from all liability, damages, claims, suits or other consequences (including but not limited to personal injury or death) *caused by or arising out of this Agreement and the access granted thereby.*

(Emphasis added). By the express language of the Access Agreements, its hold-harmless and indemnification provision applies only to those damages caused by "this Agreement and the access granted thereby." And "this Agreement" only pertains to the access of individual employees; it simply does not extend to the testing

itself or results thereof. In interpreting contracts generally and indemnity provisions specifically, "[a]ll words used must be taken in their ordinary and popular sense." *Worth v. Aetna Casualty & Surety*, 32 Ohio St.3d 238, 240, 513 N.E.2d 253 (1987). Here, the words of the Task Order and the Access Agreements clearly demonstrate that the Task Order governs the testing in the Flow Loop. Therefore, the Court finds, as a matter of law, that the Task Order, rather than the Access Agreement, is the controlling document with regard to allocating costs for the damages to Battelle's Flow Loop and Nowsco's pigs.

### B. The Definition of "Indemnify"

■ Nowsco further argues that the Task Order does not require Nowsco to indemnify Battelle for the damages to the Flow Loop facility. In support of this argument, Nowsco relies heavily upon its argument that the indemnity provision enunciated in Paragraph 6 does not apply to disputes between parties themselves, but only to claims by third parties. Nowsco cites several non-Sixth Circuit cases for the proposition that indemnification clauses have "traditionally been used to indemnify one of the contracting parties against tort liability to third parties," Ray D. *Baker Contractor, Inc. v. Chris Nelsen & Son, Inc.*, 1 Mich.App. 450, 136 N.W.2d 771, 772 (1965), and argues, further, that indemnification clauses only apply to third-party reimbursement situations and cannot be used "to protect one contracting party from liability to the other when dealing *inter se* with no third-party plaintiff concerned." *Id.* 136 N.W.2d at 773.

Nowsco's argument lacks merit. First, the term "indemnify" has *not* traditionally been held to apply only to third-party situations. The typical meaning of "indemnify" is akin to "reimburse" rather than "reimburse for losses incurred by third parties." Black's Law Dictionary supports this view, defining "indemnify" as: '

> To restore the victim of a loss, in whole or in part, by payment, repair, or re-

placement. To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him. To make good; to compensate; to make reimbursement to one of a loss already incurred by him.

Black's Law Dictionary 529 (6th ed.1991). Courts in the Sixth Circuit are uniform in viewing the word "indemnify" as analogous to "reimburse." The Sixth Circuit recently discussed the meaning of "indemnification" and concluded: "Indemnity serves to shift the burden of loss between parties when equity so requires. Indemnity shifts the entire loss from the party who has been forced to pay to the party who should properly bear the burden." *In re Air Crash Disaster v. Northwest Airlines, Inc.*, 86 F.3d 498, 548 (6th Cir.1996) (internal quotations omitted). This definition involves the shifting of losses, rather than any requirement that third party losses be involved. Similarly, the Southern District of Ohio has concluded that "Indemnity' involves a collateral contract or assurance, by which one person engages to secure another against an anticipated loss or to prevent him from being damnified by the legal consequences of an act or forbearance on the part of one of the parties or of some third person." *United States v. Pretty Products, Inc.*, 780 F.Supp. 1488, 1495 (S.D.Ohio 1991) (internal quotations omitted). This definition specifies that indemnification can apply to both to damages to the contracting parties *and* to third party injuries.

Ohio state courts are also consistent in defining "indemnification;" every modern Ohio case dealing with indemnity reiterates the Ohio Supreme Court's definition in *Travelers Indemnity Co. v. Trowbridge*, 41 Ohio St.2d 11, 321 N.E.2d 787 (1975) (rev'd on other grounds), in holding that: "Indemnity ... arises from contract, either express or implied, and is the right of a person who has been compelled to pay what another should have paid to require complete reimbursement." *See, e.g., Four*

*Seasons Environmental, Inc., v. Westfield Companies,* 93 Ohio App.3d 157, 159, 638 N.E.2d 91 (1994); *Whitney v. Horrigan,* 112 Ohio App.3d 511, 514–15, 679 N.E.2d 315 (1996). The well-accepted *Travelers Indemnity* definition does not even mention third parties. "Indemnification" is merely a tool for allocating costs between contracting parties. Even the one Ohio case cited by Nowsco for the proposition that indemnification applies only to third party damages, *Anderson v. Olmsted Utility Equip., Inc.,* 60 Ohio St.3d 124, 573 N.E.2d 626 (1991), reiterates the *Travelers Indemnity* definition. And, contrary to Nowsco's assertion, the *Anderson* Court did not propose that indemnification is *only* a third-party principle; the Court merely stated that in cases of third-party injury, indemnification *may* be used as a device to allocate payment between joint tortfeasors. Obviously, indemnification will be used in cases where third-party damages are compensated by a party which later seeks reimbursement from another party with greater liability. But indemnification is not, and has never been, *limited* to such situations.

It is clear from both the Ohio and Sixth Circuit definitions of indemnification that a party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves.

■ Nowsco argues, further, that an indemnification clause should not be available to protect one contracting party from liability to the other when dealing *inter se,* when the damages were caused by the indemnified party's own negligence. This argument has no basis in Ohio or Sixth Circuit law. The case Nowsco cites in support of this proposition, Ray D. *Baker Contractor, Inc. v. Chris Nelsen & Son, Inc.,* 1 Mich.App. 450, 136 N.W.2d 771 (1965), is a thirty-four year old Michigan case which explicitly limited its discussion to Michigan law. Like the cases Nowsco cites from various Florida and Oregon appeals courts, *Baker* is not binding upon this Court, which must apply the clearly-stated law of Ohio and the Sixth Circuit. And, in fact, the Ohio Supreme Court has explicitly spoken on this issue, holding that a party *may* contract to be indemnified for its own negligent acts, when both parties are of relatively equal bargaining power and have freely assented to such terms. *See Glaspell v. Ohio Edison Co.,* 29 Ohio St.3d 44, 47–48, 29 O.B.R. 393, 505 N.E.2d 264 (1987). In such cases, the clause limiting liability of the drafter need not be strictly construed. *See id.* at 47, 29 O.B.R. 393, 505 N.E.2d 264. Ohio courts have traditionally upheld exculpatory clauses executed by parties with relatively equal bargaining power, under a theory of freedom of contract. *See, e.g., Mansfield Mutual Ins. Co. v. Cleveland, Cincinnati, Chicago & St. Louis R.R. Co.,* 74 Ohio St. 30, 77 N.E. 269 (1906); *Berjian v. Ohio Bell Telephone Co.,* 54 Ohio St.2d 147, 375 N.E.2d 410 (1978). The question of whether Battelle performed negligently is a question of fact which must go to a jury, as discussed, *infra;* and, unless the jury finds that Nowsco was not at fault to any extent, Nowsco is required to indemnify Battelle pursuant to the clear, bargained-for terms of the Task Order.

■ The language of the Task Order makes clear that Battelle and Nowsco intended for the terms to be binding with respect to damages incurred by the contracting parties. Paragraph 6 states Nowsco will "indemnify and hold Battelle harmless from *any and all liability, claims, demands, damages,* and all costs and expenses in connection therewith ...." (emphasis added). It does not say "for claims brought by third parties." Nowsco could have added such language if it so intended to narrow the indemnity provision. Indemnity agreements are interpreted, like any contract, to conform to the intent of the parties. *See Worth,* 32 Ohio St.3d at 240–41, 513 N.E.2d 253.

Here, the parties' intent is clearly stated in Paragraph 6: *all* liability and damages are covered by the indemnification clause—not just third party damages. When the terms of a contract are clear and unambiguous, no genuine issues of material fact remain and the trial court may enter judgment as a matter of law. *See Davis v. Loopco Industries, Inc.*, 66 Ohio St.3d 64, 65, 609 N.E.2d 144 (1993). In this case, the Court holds, as a matter of law, that the indemnification agreement applies to damages suffered by any entity, including Battelle.

### C.  A Question of Fact

■ A key question of fact remains unanswered and must be evaluated by a jury: was Nowsco's "fault" a contributing cause of the damage from the Flow Loop explosion? This is a crucial issue, because it will determine if the exception in the indemnification and hold-harmless provision of the Task Order is applicable. If the jury finds that Nowsco's "fault" was a contributing cause of the accident, Nowsco will, first, be obligated to indemnify Battelle for the damage to the Flow Loop, and, second, will not be able to maintain a claim against Battelle for damage to Nowsco's MFL pigs. If, however, the jury finds that Nowsco was faultless, Nowsco will have no obligation to indemnify or hold Battelle harmless for liability.

Both Battelle and Nowsco have argued that an expert evaluation, performed by Kiefner and Associates, an independent third party, proves that each party, respectively, was not at fault for the accident. Nowsco asserts that "[t]he study of the accident, conducted by an independent third party, found no fault on Nowsco's part and concluded that the explosion would not have occurred but for Battelle's use of air as the test loop medium." On

the other hand, Battelle contends that "there can be no genuine issue of fact that Nowsco, at the very least, contributed to the cause of the incident." Both parties are wrong. The Kiefner Report describes Battelle's facility, the MFL pig testing, and a subsequent examination of the damaged loop. It enumerates a few scientific conclusions, such as: the pipe had been heated locally prior to rupturing, though the pipe itself was not a contributor to the incident; the likely cause for ignition of the fire was the heat of friction between the front of the pusher pig and the inside surface of the pipe; both fuel for the fire (organic and metallic materials on the pig) and an oxidizer (air used to propel the pig through the pipe) were present to sustain a fire given an ignition source; and that the use of air entails the greatest risk for supporting combustion. *The Kiefner Report does not conclude to what degree each party was at fault.* Rather, a jury must consider the facts and scientific conclusions reached by Kiefner & Associates (and whatever other experts the parties might choose to call) and determine, based on these facts, who was at fault and to what degree. This is an essential question of fact, which must be considered by the finder of fact. It is certainly not appropriate for this Court to decide on summary judgment, or as a matter of declaratory law, who was at fault for the accident.

### D.  Breach of Warranty and Tort Theories[2]

#### 1.  Nowsco's Breach of Warranty Claim

■ Battelle asks the Court to dismiss Count II of Nowsco's Counterclaim, in which Nowsco alleges that Battelle breached express or implied warranties. Battelle argues that it properly excluded all war-

---

**2.** Battelle and Nowsco have both addressed these questions by citing cases which deal with the sale of goods and product liability. Both parties concede, however, that this contract deals with *services* —an important distinction. Contracts which merely call for the

rendition of services are not subject to the sales provisions of the Uniform Commercial Code, *see Wells v. 10–X Manufacturing Company*, 609 F.2d 248, 254 (6th Cir.1979), and cases dealing with the tort theories of product and strict liability are inapposite.

ranties accompanying the Task Order through its bold-faced disclaimer in Paragraph 6. The disclaimer states:

BATTELLE PROVIDES NO WARRANTY OR GUARANTY OF RESULTS, INCLUDING WARRANTIES OF FITNESS FOR PURPOSE OR OF MERCHANTABILITY FOR ANY ITEM OR RESEARCH RESULT WHICH MAY BE DELIVERED UNDER THIS AGREEMENT. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

This exclusion specifically mentions the warranties of merchantability and fitness and, written in all capital letters, is conspicuous. This disclaimer thus conforms to the requirements for disclaiming warranties as set out by the Ohio Code. (although, of course, the Code does not control this contract for services, it is a compelling of how a services contract should disclaim warranties). Ohio Rev. Code § 1302.29(B) states:

... to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in the case of a writing must be conspicuous, and t exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

The Court concludes, therefore, that Battelle did properly limit its warranties.

Nowsco argues that Battelle's disclaimer did not eliminate all warranties under the contract, pointing out that the mention of warranties of fitness and merchantability are only made in reference to "any item, or research result which may be delivered under this agreement." Nowsco maintains that its counterclaim does not involve any product or research result, and that, therefore, the elimination of these warranties has no effect on Nowsco's claim for dam-

ages to its MFL pig. The Court finds, however, that the first portion of the disclaimer, which provides that "Battelle provides no warranty or guaranty of results" combined with the statement that "there are no warranties which extend beyond the description on the face hereof" is comprehensive, and covers all potential warranties.

Nowsco claims that Battelle breached implied warranties: (1) that the testing procedure implemented by Battelle would not damage the personal property belonging to Nowsco, and (2) that Battelle would conduct itself in a workmanlike manner. Nowsco asserts that these warranties were not eliminated by the Battelle's disclaimer. Based on the case of *Hunsicker v. Buckeye Union Casualty Co.,* 95 Ohio App. 241, 118 N.E.2d 922 (1953), Nowsco claims there is an implied warranty under the circumstances in this case. The *Hunsicker* Court held that "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract." *Id.* 118 N.E.2d at 924. The *Hunsicker* formulation, however, merely restates the duty imposed on every party to a contract for services, and the failure to perform accordingly amounts to negligence or a breach of contract, not a breach of warranty.

Further, Nowsco argues that language in Paragraph 5 of the Task Order constitutes an express warranty by Battelle. This argument is not persuasive. Paragraph 5 provides:

Battelle agrees to provide a high standard of professional service and will exert its best efforts within the time and funds authorized for each task program. However, the result of this program will be advisory and/or experimental in nature. Therefore, in no event shall Battelle of its employees and agents have any obligation or liability for damages, including, but not limited to, consequen-

tial damages, arising out of or in connection with Client's use, or inability to use, the information, apparatus, method or process resulting form any task project. While the first sentence of this provision supports Nowsco's argument, the rest of the paragraph, disclaiming all sorts of liability, does not. The Court finds that nothing in Paragraph 5 amounts to an express warranty. For these reasons, the Court finds that the express disclaimer and hold-harmless language which Battelle provided in Paragraphs 5 and 6 of the Task Order prevent Nowsco from bringing a breach of warranty claim for damages to its pigs.

### 2. Nowsco's Tort Claim

■ Battelle also has moved for summary judgment on Count III of Nowsco's Counterclaim, which asks to be awarded damages for the harm to Nowsco's pigs under a negligence theory. Again, Battelle claims that its hold-harmless provision and disclaimer of warranties prevents Nowsco from bringing any type of action against Battelle. Battelle is correct.

Throughout its Motion for Declaratory Judgment, Nowsco has repeatedly implored the Court to "interpret all words in their ordinary and popular sense," *Worth v. Aetna Casualty & Surety*, 32 Ohio St.3d 238, 240, 513 N.E.2d 253 (1987), and to employ the rule that where "a writing employs clear, precise and unambiguous terms, a court should give it the meaning which [the words] naturally present." *Ozko, Inc. v. Isaacson Construction, Inc.*, 1995 WL 678548, *3 (Ohio App. 9 Dist. Nov. 15, 1995).

Applying these principles to the language of the Task Order Agreement, it is apparent that Nowsco cannot maintain a tort claim against Battelle unless the jury finds that Nowsco was not at fault in the Flow Loop Accident. In the Task Order, Nowsco agreed "to indemnify and hold Battelle harmless from *any and all liability, claims, demands, damages, and all costs and expenses* in connection there-with, for or arising out of Battelle's performance under this agreement, except for injury or damage directly resulting during performance of the agreement activities on Battelle-owned premises where fault of [Nowsco] is not a contributing cause of such injury or damage." This language is clear, precise and unambiguous. Nowsco agreed to release Battelle for *all* liability related to the Flow Loop testing unless Nowsco was completely faultless. In making this agreement, both parties were large, sophisticated commercial participants, dealing with each other at arm's length; and their intent is clear from the language of their contract. If the jury finds that Nowsco was at fault, to any extent, the Court will not allow Nowsco to make an end-run around the hold-harmless clause by simply labeling the claim as sounding in tort. If however, the jury finds that Nowsco was faultless, the hold-harmless provision will not apply, and Nowsco may pursue its negligence claim for damages to its MFL pigs.

## V. CONCLUSION

In summary, the Court finds as follows. With regard to Battelle's Motion for Summary Judgment:

(1) Count V of Battelle's Amended Complaint is **DENIED.** Material issues of fact remain as to whether Nowsco was at fault for the accident.

(2) Count I of Defendants' Counterclaim (Negligence) is **DENIED,** to the extent that Nowsco may recover under tort theories if the jury finds that it was not at fault for the accident;

(3) Count II of Defendant's Counterclaim (Warranties) is **GRANTED,** because Battelle expressly disclaimed warranty liability.

(4) Count III of Defendants' Counterclaim (Breach of Contract) is **DENIED,** because the material issue of fact as to Nowsco's fault remains.

With regard to Nowsco's Motion for Declaratory Judgment:

(1) Count III of Plaintiff's Amended Complaint (Breach of Written Contract) is **DENIED,** as the issue of Nowsco's fault remains.

(2) Count V of Plaintiff's Amended Complaint (Declaratory Judgment) is **DENIED** for the same reason.

**IT IS SO ORDERED.**